Atty No. 34878

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| BRIAN T. SULLIVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 L 1973 |
| | ) | |
| ALAIN KODSI, ANTONIO GRACIAS, MG | ) | Judge Ronald F. Bartkowicz |
| CAPITAL LLC., INDUSTRIAL POWDER | ) | |
| COATINGS ACQUISITION CORP., AMAX | ) | Jury Trial Demanded |
| PLATING, INC., an Illinois corporation, AJG | ) | |
| REAL ESTATE LLC, AJG GROWTH FUND | ) | |
| LLC, AJG MG LLC, and NEUBERGER | ) | |
| BERMAN TRUST COMPANY OF | ) | |
| DELAWARE as trustee of the GAMCREFK | ) | |
| TRUST, | ) | |
| Defendants. | ) | |

## FOURTH AMENDED COMPLAINT

Plaintiff Brian T. Sullivan ("Sullivan"), by his undersigned attorneys, for his Fourth

Amended Complaint against Defendants, Alain Kodsi ("Kodsi"), MG Capital LLC ("MG

Capital"), and Neuberger Berman Trust Company of Delaware as trustee of the GAMCREFK

Trust ("GAMCREFK"), alleges as follows:

### THE PARTIES

1.    Sullivan is, and has been at all relevant times, a resident of Cook County, Illinois.

2.    Kodsi is, and has been at all relevant times, a resident of New York.

3.    MG Capital is, and has been at all relevant times, a Delaware limited liability

corporation.

4.    On information and belief, Kodsi is managers of and/or has control over the

affairs of MG Capital, either directly or through other entities that owns or controls.

5.    GAMCREFK is a trust settled by Kodsi into which Kodsi has transferred all or

substantially all of his assets to shield them from Kodsi's creditors.

## BACKGROUND

6.     In October 1996, Antonio Gracias ("Gracias") and Defendant Alain Kodsi convinced Sullivan to leave a lucrative job and join them in finding and purchasing mid-sized companies. Sullivan, Gracias and Kodsi became partners. Sullivan, Kodsi and Gracias agreed, in part, that they would invest equally in any acquisitions which Sullivan identified, helped identify, or otherwise worked on with Kodsi and Gracias. Sullivan, Kodsi and Gracias intended to carry out, and thereafter did carry out, their efforts on behalf of the Partnership both individually and through MG Capital, which was formed seven months later in May 1997.

7.     In or about October, 1997, Sullivan identified an attractive company for the Partnership to pursue. This company is called Industrial Powder Coatings, Inc. ("IPC") and its primary business is painting metal components for the automotive and appliance industries using a powderized paint coating process. In February 1998, IPC became available for purchase by the Partnership, and Sullivan began working on acquiring the company with Gracias and Kodsi. On or about February 26, 1998, MG Capital executed a letter of intent agreement to purchase IPC from its parent corporation. Gracias and Kodsi, through a new corporation they formed, and not MG Capital purchased the company on or about June 15, 1998. Notwithstanding several demands by Sullivan, Gracias and Kodsi denied Sullivan his right to invest in the company. Had Sullivan been allowed to invest in the company as agreed, Sullivan's interest would be worth at least $13 million.

8.     Sullivan has denied and continues to deny that he had an agreement with MG Capital or that he was ever an employee of MG Capital. Sullivan insists that his agreement to work in partnership with Kodsi and Gracias to find and invest in mid-sized companies has always been an agreement with Kodsi and Gracias individually, notwithstanding their later formation of MG Capital seven months after the agreement was made, and two months after Sullivan began working in the partnership with them. Moreover, Sullivan denies ever having been a manager, member or officer of MG Capital. Sullivan has denied and continues to deny

that any agreement he may have had with MG Capital, or any agreement that he may be found to have had with MG Capital precludes Sullivan's claims against Gracias and Kodsi.

16.    9.    However, Kodsi, Gracias, and MG Capital alleged in their now dismissed Counterclaim that all three of them were parties to an agreement with Sullivan to find and acquire mid-sized companies for investment.  In addition, MG Capital has alleged in a case filed in the Northern District of Illinois, that it had an agreement with Sullivan.  Moreover, Kodsi, Gracias, and MG Capital have admitted that Sullivan was entitled to invest in certain acquisitions along with Kodsi and Gracias as individual investors.

17.    10.    Thus, Gracias and Kodsi have admitted that Sullivan had a business relationship with them individually during the same time, and for the exact same activities that MG Capital now claims Sullivan performed for MG Capital as its employee.  As Judge Goldberg held:

> More importantly, [Kodsi and Gracias] have admitted that the oral agreement existed and that the subject matter of that agreement–to share in the profits– is the same as alleged in the Second Amended Complaint.

18.    11.    Shortly after the Counterclaim was dismissed, either Kodsi or Gracias, or both, caused MG Capital alone to file a complaint against Sullivan in federal court containing substantially the same claims that Kodsi and Gracias individually made against Sullivan in the Counterclaim -- MG Capital LLC v. Brian T. Sullivan, et al., (Case No. 5815, Northern District of Illinois, 2001) (the "Federal Case").  Based on MG Capital's allegations contained in it's Complaint in the Federal Case, and in the event those allegations are somehow established, Sullivan now alleges that MG Capital was a party to the agreement set forth below.

**Sullivan's Relationship with Kodsi and Gracias**

19.    12.    In approximately July 1996, Kodsi began discussions with Sullivan about working together to purchase mid-sized companies for investment.

20.    13.    By July 1996, Kodsi and Gracias were working together on a continuing basis to purchase mid-sized companies for investment.  By that time, Kodsi and Gracias, through a new

corporation they formed, already had purchased and owned Electronic Plating Services, Inc. ("EPS"), a company that metal plates electrical connectors for the electronics and computer industries.

21    14.    Kodsi and Gracias told Sullivan that Kodsi and Gracias intended to do more acquisitions both in the electrical connector plating industry and in various other industries. Kodsi and Gracias told Sullivan that, through their acquisition and operation of EPS, Kodsi and Gracias had established a solid relationship with the senior secured lender that financed the deal, as well as contacts with other financing sources. Kodsi and Gracias told Sullivan that they had good "deal flow," meaning that they had several leads on potential acquisitions and contact people who could provide such leads. However, they stated that they did not have enough time or manpower to sort out and evaluate desirable acquisition opportunities. They said they would need experienced "operators" to run the companies they purchased. They told Sullivan that they wanted to establish formal relationships with others to purchase companies for investment. They asked Sullivan if he was interested in working with them. They told Sullivan that they were interested in working with him because he had a strong background in operations, management, and leadership.

22    15.    In September 1996, Kodsi, Gracias, and Sullivan entered into an oral agreement (the "Agreement") to establish a business relationship (the "Business Relationship") to find, and purchase mid-sized companies for investment.

23    16.    The material terms of the Agreement were as follows:

  a.    Kodsi, Gracias, and Sullivan would invest equally in any acquisitions which Sullivan identified, helped identify, or otherwise worked on with MG Capital.

  b.    Kodsi and Gracias would:  (I) help Sullivan find acquisitions, and provide Sullivan with potential acquisition leads and access to contacts and intermediaries known to them to have acquisition leads; (ii) work with Sullivan to identify, analyze, negotiate, and

close acquisitions; (iii) secure debt financing for the acquisitions; (iv) reasonably assist Sullivan, if necessary, in raising Sullivan's equity contribution to participate in their first acquisition; and (v) provide office space and cover overhead expenses for the Business Relationship.

c. Sullivan would: (I) identify potential acquisitions through contacts, leads, and intermediaries known to Sullivan, as well as those of MG Capital; (ii) work with MG Capital to identify, analyze, negotiate, and close acquisitions; (iii) operate the acquired companies either on a full-time basis or through other managers hired to manage the day-to-day operations of those companies.

d. Kodsi and Gracias would recover expenses it incurred (i.e. office, accounting, legal, etc.) through one-time management fees charged to the acquired companies after they were purchased.

e. Sullivan would not receive any compensation from Kodsi, Gracias, or MG Capital.

f. Once the first acquisition was completed, Sullivan would thereafter receive a salary from the acquired company.

17. Sullivan began working in Chicago on March 14, 1997.

18. In March 1997, Gracias was enrolled as a full-time student at the University of Chicago Law School.

19. In March 1997, Kodsi was working full-time for Merrill Lynch in New York. Sullivan was the only person working full-time in the Business Relationship at that time.

20. Sullivan began working out of a spare bedroom in Gracias's home which had been converted into a home office. In or about May 1997, the Business Relationship established offices at 116 W. Illinois Street.

21. On or about May 7, 1997, Kodsi and Gracias formed MG Capital and made themselves Managing Members. Kodsi and Gracias have always been the only owners (either directly or through other entities they owned), members, and managers of MG Capital during the times relevant to this Complaint and Counterclaim.

29    22.    Kodsi and Gracias intended to carry out, an thereafter did carry out, their efforts on behalf of the Business Relationship both individually and through MG Capital.  Kodsi and Gracias have admitted that they used MG Capital to carry out their prior efforts to find and acquire companies.  In sworn testimony, Kodsi has stated that MG Capital is a "vehicle" for he and Gracias to make certain investments as individuals.

30    23.    Although Sullivan contends that Kodsi and Gracias were the only parties to the Agreement, based on Kodsi, Gracias, and MG Capital's allegations to the contrary, Sullivan now pleads, that when MG Capital was formed, Sullivan, Kodsi and Gracias agreed to carry out the Business Relationship by, through, and with MG Capital as a party to the Agreement.

31    24.    In support of Sullivan's alternative pleadings in this Third Amended Complaint, MG Capital, Kodsi, and Gracias have already admitted here that Sullivan was a party to an agreement with MG Capital, Kodsi, and Gracias to co-invest on an equal basis with Kodsi and Gracias on certain acquisitions that Sullivan identified and/or worked on.  In addition, MG Capital has already admitted in the Federal Case that Sullivan was a party to an agreement with MG Capital to co-invest on an equal basis with Kodsi and Gracias on certain acquisitions that Sullivan identified and/or worked on.  The acquisition of IPC was one such acquisition.

**Sullivan Identifies Industrial Powder**
**Coating as a Potential Acquisition**

32    25.    In or about October 1997, Gracias handed Sullivan a letter that he received from Dubilier & Co. (the "Dubilier Letter").  The Dubilier Letter contained a list of all potential acquisitions that Dubilier & Co. was then contemplating.  According to Gracias, this was a routine letter sent out regularly to Dubilier & Co.'s investors and other select individuals to keep them informed of the company's activities.

33    26.    Gracias asked Sullivan to review the Dubilier Letter and identify any companies on the list that Sullivan would be interested in acquiring.

27.    Sullivan reviewed the Dubilier Letter and identified one company on the list to pursue—Industrial Powder Coatings, Inc. ("IPC").  Sullivan returned the Dubilier Letter to Gracias with a short note explaining why he was interested in IPC.

28.    Gracias then told Sullivan that, in the event Dubilier & Co. decided not to pursue an acquisition of IPC, he would make arrangements with Dubilier & Co. to have them notify either the owners of IPC or the intermediary involved in the sale of the company, that MG Capital was interested in acquiring IPC.

29.    IPC's principal business is painting metal components for the automobile and home appliance industries using a powderized paint coating process.

30.    In or about early to mid-February 1998, Gracias informed Sullivan that Dubilier & Co. had decided not to acquire IPC.  Gracias also said he had received a confidential business review book ("CBR") prepared by Brown, Gibbons, Lang & Co., L.P., an investment banking firm that was assisting the owner of the company, Intermet Corporation ("Intermet"), in the sale of IPC.  The CBR contained detailed information about IPC, including historical and pro-forma financial information.

31.    Gracias handed the CBR to Sullivan to assist in the evaluation and acquisition of IPC.

32.    Between approximately February 10 and February 23, 1998, Sullivan worked on analyzing the CBR and reviewing IPC's financial information.  Sullivan and Gracias had at least two discussions during that period about acquiring IPC.

33.    On or about February 19, 1997, Gracias told Sullivan that he and Kodsi would be on the East Coast the following week, on unrelated business, and had arranged to meet with executives from Intermet and IPC and tour the IPC manufacturing facilities in Ohio.

34.     At Gracias' request, Sullivan prepared a memorandum containing a detailed list of questions and other information needed to further evaluate IPC and prepare a preliminary purchase offer.  Sullivan handed two copies of the memorandum to Gracias on February 23, 1998 with instructions to give Kodsi one copy.

35.     On or about February 25 and/or February 26, 1998, MG Capital negotiated and entered into a letter agreement (the "Letter Agreement") with Intermet Corp. ("Intermet") for MG Capital to purchase all of the outstanding shares of IPC from Intermet (the "IPC Acquisition").

**MG Capital, Kodsi, and Gracias Freeze Out Sullivan**

36.     On February 27, 1998, Kodsi and Gracias arrived at the MG Capital offices in Chicago and immediately called a meeting with Sullivan to discuss the IPC Acquisition (the "February 27 Meeting").

37.     At the February 27 Meeting, Kodsi and Gracias, on behalf of themselves and MG Capital, told Sullivan that Sullivan would not be investing in the purchase of IPC with them.

38.     At the February 27 Meeting, Kodsi explained to Sullivan that the purchase price they had negotiated for IPC was very high and that they and MG Capital were only interested in purchasing IPC to merge it with their other two companies, Amax Plating, Inc. ("Amax") and EPS.  Amax, a company in the electrical connector electroplating industry, had been acquired by Kodsi and Gracias through Connector Service Corporation ("CSC") in March 1997.  Kodsi said their plan was to then make a public offering of the combined entity within the next 12 months.  According to Kodsi and Gracias, purchasing IPC made no economic sense otherwise.

39.     At the February 27 Meeting, Kodsi went on to explain that, because Sullivan had no involvement at all in the EPS and Amax acquisitions, it would be "unfair" to Kodsi and Gracias if Sullivan were allowed to invest in IPC.

40.    In response, Sullivan told Kodsi that he only wanted to invest in IPC in accordance with their Agreement and wanted no ownership at all in either EPS or Amax.  If the three companies were to be combined, Sullivan said he would agree to an equitable division of ownership in the new entity based on the respective cash flows of each of the three companies.

41.    At the February 27 Meeting, Kodsi and Gracias, on behalf of themselves and MG Capital, reiterated that they would definitely merge and operate the three companies together and take the new entity public within the next 12 months.  Kodsi and Gracias also reiterated that this was the reason that Sullivan could not invest in IPC with them and MG Capital.

42.    In reliance on Kodsi, Gracias, and MG Capital's statements and representations at the February 27 Meeting, Sullivan ceased working on the IPC Acquisition.

43.    Between approximately May 28 and June 8, 1998, Sullivan learned that several friends and family members of Kodsi and Gracias had been invited by Kodsi, Gracias, and MG Capital to invest in the acquisition of IPC.  None of these investors had any involvement in the transaction (other than as investors or lenders) prior to that time.  Kodsi, Gracias, and MG Capital never told Sullivan during that time period that they had invited Kodsi and Gracias' friends and family members, who were not parties to the Agreement, to invest in IPC.  Some or all of these individuals agreed to, and did, invest in IPC.

44.    On information and belief, on or about June 15, 1998, Kodsi, Gracias, or both caused the formation of  a new corporation called Industrial Powder Coatings Acquisition Corp. ("IPCAC") to purchase IPC.  On information and belief, Kodsi and Gracias owned approximately 80% of that acquisition company, either directly or through other entities they owned.  On information and belief, Kodsi's and Gracias' friends, family members, and selected outside investors owned the remainder of the acquisition company.  On information and belief, IPCAC purchased IPC on or about June 15, 1998.

45.     On or about June 15, 1998, while the Letter Agreement between MG Capital and Internet to purchase IPC was still in effect, IPCAC, and not MG Capital, acquired IPC. IPCAC, MG Capital, Kodsi, and Gracias together excluded Sullivan from investing in the IPC Acquisition. Neither IPCAC nor MG Capital have ever owned any shares in each other, either directly or indirectly. Neither IPC nor MG Capital have ever owned any shares in each other, either directly or indirectly.

46.     On June 22, 1998, just one week after the IPC Acquisition was completed, Gracias told Sullivan that (a) the IPC Acquisition was a completely separate and distinct transaction from Gracias' and Kodsi's acquisition and ownership of EPS and Amax; (b) Gracias and Kodsi had no intention of operating the three companies together; and (c) IPC did business in a separate and distinct industry from that of EPS and Amax. This information was contrary to what Sullivan had been told by Gracias and Kodsi on February 27, 1998.

**Sullivan Demands His Right to Invest in IPC**

47.     On July 20, 1998, Sullivan met with Gracias to discuss various other potential acquisitions on which he was working (the "July 20 Meeting").

48.     At the July 20 Meeting, Sullivan asked Gracias when he and Kodsi planned to merge EPS, Amax, and IPC, and make a public offering for the combined entity. Gracias said that he and Kodsi had no plan to merge the three companies and go public. Sullivan reminded Gracias that his rationale for excluding Sullivan from the IPC Acquisition was the planned merger with EPS and Amax, followed by a public offering of shares. Sullivan then demanded to exercise his right to invest in IPC in accordance with their Agreement.   Gracias, on behalf of himself, Kodsi and MG Capital, refused.

49.     On August 3, 1998, Sullivan met alone with Kodsi in Chicago. Sullivan explained to Kodsi that, based on Gracias' statements to him at the July 20 Meeting, Kodsi and

Gracias had lied to him and wrongfully excluded him from the IPC deal. Sullivan demanded the right to invest in IPC in accordance with their Agreement. Kodsi, on behalf of himself, Gracias and MG Capital, refused.

50.    On August 4, 1998, Sullivan faxed a letter to Gracias, Kodsi, and MG Capital terminating all associations and business relationships with them.

51.    At the July 20 Meeting, Gracias had told Sullivan that IPC was purchased for approximately $22 million. This was approximately $4 million less than the purchase price negotiated in the Letter Agreement executed in February 1998.

52.    Kodsi, Gracias, and MG Capital intentionally and in bad faith, never disclosed to Sullivan that, subsequent to execution of the Letter Agreement, they had negotiated a substantial reduction in the purchase price.

53.    At the February 27 Meeting, Kodsi had represented to Sullivan that the purchase price for IPC contained in the Letter Agreement was approximately 5.7 times IPC's trailing 12 months of earnings before interest, taxes, depreciation, and amortization ("EBITDA").

54.    On information and belief, Kodsi, Gracias, and MG Capital knew, or had reason to know, that the purchase price contained in the Letter Agreement was substantially less than 5.7 times IPC's trailing 12 months of EBITDA.

55.    After the IPC Acquisition was completed, Sullivan learned that the purchase price for IPC set forth in the Letter Agreement actually was less than five times IPC's recast EBITDA for calendar year 1997 and that the final purchase price for IPC was less than four times IPC's recast EBITDA for calendar year 1997.

56.    Kodsi, Gracias, and MG Capital intentionally and in bad faith, never disclosed to Sullivan before the acquisition was completed that the purchase price for IPC set forth in the Letter Agreement was actually less than five times IPC's recast EBITDA for calendar year 1997,

and that the final and actual purchase price paid for IPC was less than four times IPC's recast

EBITDA for calendar year

57.    At the time that the IPC Acquisition was completed, IPC had a market value in

continued use of at least $32 million.  That value was far in excess of the purchase price paid for

IPC.

58.    A relatively small amount of equity capital was needed (and used) to purchase

IPC.  Most of the purchase price was borrowed by using the existing assets of IPC as collateral.

59.    IPC was acquired on very favorable terms.

60.    Sullivan was excluded from this extremely lucrative investment so that Kodsi,

Gracias, and MG Capital could retain the benefits of the investment for themselves, selected

outside investors, and Kodsi and Gracias' friends, and family members without having to share

those benefits with Sullivan.  Sullivan was also deprived of a lucrative job and salary from IPC

after the acquisition was completed.

61.    IPC has always been owned and operated separately from EPS and Amax.  All

three companies remain privately held.

62.    There never has been a public offering of IPC stock.

<u>**COUNT I**</u>
**(Breach of Partnership)**

63.    Sullivan incorporates the allegations of Paragraphs 1 through 62 as Paragraph 63

as if fully set forth herein.

64.    Although Sullivan denies that MG Capital was ever a party to the Agreement,

based on MG Capital's allegations and admissions, Sullivan alleges for purposes of this Count

only, that MG Capital was a party to the Agreement and a partner with Sullivan, Kodsi and

Gracias.  Sullivan also alleges, for purposes of this Count, that the Agreement established a

partnership between and among Sullivan, Kodsi, Gracias, and MG Capital.

65.    Sullivan, Kodsi, Gracias and MG Capital agreed to work together as a general business enterprise to find, and purchase mid-sized companies for investment (the "Partnership Agreement"). The terms of the Partnership Agreement are set forth above.

66.    Moreover, from approximately July 1996 to July 20, 1998, Sullivan, Kodsi, Gracias and MG Capital's conduct established, by facts, circumstances, and course of dealing: (I) the Agreement and intent to form a partnership, (ii) the existence of the Partnership, and (iii) the specific terms of the Partnership Agreement.

67.    From July to September 1996, Sullivan, Kodsi, and Gracias discussed working together to find, and purchase mid-sized companies for investment. Sullivan, Kodsi, and Gracias also discussed Sullivan co-investing with Kodsi and Gracias in such acquisitions as well as receiving a salary from the first company acquired.

68.    None of Sullivan, Kodsi, Gracias and MG Capital have ever employed any of each other as employees or independent contractors in carrying out the activities of the Partnership.

69.    Sullivan never received any wages, salary or other compensation from Kodsi, Gracias or MG Capital.

70.    Kodsi, Gracias and MG Capital told numerous third parties about their relationship with Sullivan in working together as a business enterprise to find, and purchase mid-sized companies for investment. On at least two separate occasions, Gracias testified under oath acknowledging this relationship with Sullivan.

71.    Sullivan, Kodsi, Gracias and MG Capital held themselves out to third parties as "partners" in carrying out the Partnership's activities.

72.    For nearly one and a half years, Sullivan, Kodsi, Gracias and MG Capital worked together, and for each other's benefit, to find, and purchase mid-sized companies for investment.

- 13 -

Sullivan, Kodsi, Gracias and MG Capital acted as agents for each other with third parties in furthering the Partnership's purpose.

73. Sullivan, Kodsi Gracias, and MG Capital specifically discussed Sullivan's one-third equity contribution towards acquiring various companies, and Sullivan's potential salary in the event such companies were acquired.

74. Kodsi, Gracias, and MG Capital helped Sullivan find potential acquisitions.

75. Kodsi, Gracias, and MG Capital provided Sullivan with potential acquisition leads.

76. Kodsi, Gracias, and MG Capital provided Sullivan with access to contacts and intermediaries known to them to have acquisition leads.

77. Kodsi, Gracias, and MG Capital worked with Sullivan to secure debt financing for potential acquisitions.

78. Sullivan identified potential acquisitions through contacts, leads, and intermediaries known to Sullivan.

79. Sullivan identified potential acquisitions through contacts, leads, and intermediaries known to Kodsi, Gracias, and MG Capital.

80. Sullivan devoted a substantial amount of his working time to Partnership activities.

81. On information and belief, Kodsi, Gracias, and MG Capital had an agreement among themselves to invest equally in companies purchased through their and MG Capital's efforts.

82. On information and belief, Kodsi, Gracias, and MG Capital had oral agreements between themselves and other third-party individuals to find, and purchase mid-sized companies for investment under terms similar to the Partnership Agreement.

- 14 -

83.    The Partnership Agreement did not provide for any specified duration of time, or any termination date or event.

84.    Sullivan, Kodsi, Gracias and MG Capital associated themselves as partners.

85.    Sullivan, Kodsi, Gracias and MG Capital agreed to, and thereafter did hold a joint interest in the Partnership through their collective contributions of effort, skill, knowledge, financial resources, and business relationships; and their right and commitment to invest equally in purchasing companies. Sullivan contributed substantial management and deal experience to the Partnership which he gained over several years as a successful military officer, mergers and acquisition counsel for a public company, and General Manager of a public company; and through his educational experiences where he earned B.S., J.D., and M.B.A. degrees from top universities. At the time the Partnership Agreement was formed, MG Capital, Kodsi, and Gracias lacked similar degrees of experience and knowledge. Sullivan's background as an "operator" was intended to complement Kodsi and Gracias' experience as financiers thereby enhancing the reputation, credibility, and capabilities of the Partnership.

86.    Sullivan, Kodsi, Gracias and MG Capital expressly agreed, and thereafter did exercise joint control over the Partnership's activities

87.    Sullivan, Kodsi, Gracias and MG Capital expressly agreed to share in the profits and losses of the Partnership as follows:

a.    Sullivan, Kodsi and Gracias would each contribute up to one-third of the equity capital required to purchase each company, and would thereafter share in the profits and losses of any acquired companies as shareholders.

b.    Kodsi, Gracias, and MG Capital would pay for the overhead expenses incurred by the Partnership and would be reimbursed for these expenses through one-time management fees paid by each acquired company after it was acquired.

c.    Sullivan would be employed by, and thereafter receive a salary from the first company acquired through the Partnership.

- 15 -

88.    Sullivan complied with all of the terms and conditions of the Partnership Agreement.

89.    Sullivan had a right under the Partnership Agreement to invest in the IPC Acquisition.

90.    Sullivan is, and at all relevant times has been, ready, willing, and able to invest in the IPC Acquisition consistent with the terms of the Partnership Agreement.

91.    Kodsi, Gracias, and MG Capital breached the Partnership Agreement by excluding Sullivan from investing in the IPC transaction.  Kodsi, Gracias, and MG Capital also breached the Partnership Agreement by depriving Sullivan of a lucrative job and salary from IPC following the acquisition.

92.    As a consequence of the foregoing breach, Sullivan suffered damages.  On information and belief, those damages exceed $13 million.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and against the Defendants MG Capital and Kodsi on Count I in an amount to be proved at trial but not less than $13,000,000, plus costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

### COUNT II
**(Breach of Joint Venture Agreement)**
**(In the Alternative to Count I)**

93.    Sullivan incorporates the allegations of Paragraphs 1 through 62 as Paragraph 93 as if fully set forth herein.

94.    Although Sullivan denies that MG Capital was ever a party to the Agreement, based on MG Capital's allegations and admissions, and in the alternative to Count I, Sullivan alleges for purposes of this Count only, that MG Capital was a party to the Agreement and a joint

venturer with Sullivan. Sullivan also alleges, for purposes of this Count, that the Agreement established a joint venture between and among Sullivan and MG Capital.

95.    Sullivan and MG Capital agreed to work together as a general business enterprise to find, and purchase mid-sized companies for investment (the "Joint Venture Agreement"). The terms of the Joint Venture Agreement are set forth above.

96.    Moreover, from approximately July 1996 to July 20, 1998, Sullivan and MG Capital's conduct established, by facts, circumstances, and course of dealing: (I) the Agreement and intent to form a joint venture (ii) the existence of the Joint Venture, and (iii) the specific terms of the Joint Venture Agreement.

97.    From July to September 1996, Sullivan, Kodsi, and Gracias discussed working together to find, and purchase mid-sized companies for investment. Sullivan, Kodsi, and Gracias also discussed Sullivan co-investing with Kodsi and Gracias in such acquisitions as well as receiving a salary from the first company acquired.

98.    Neither Sullivan nor MG Capital have ever employed any of each other as employees or independent contractors in carrying out the activities of the Joint Venture.

99.    Sullivan never received any wages, salary or other compensation from MG Capital.

100.    MG Capital told numerous third parties about their relationship with Sullivan in working together as a business enterprise to find, and purchase mid-sized companies for investment. On at least two separate occasions, Gracias testified under oath acknowledging this relationship with Sullivan.

101.    Sullivan and MG Capital held themselves out to third parties as "partners" in carrying out the Joint Venture's activities.

102.    For nearly one and a half years, Sullivan and MG Capital worked together, and for each other's benefit, to find, and purchase mid-sized companies for investment. Sullivan and MG Capital acted as agents for each other with third parties in furthering the Joint Venture's purpose.

103.    Sullivan and MG Capital specifically discussed Sullivan's one-third equity contribution towards acquiring various companies, and Sullivan's potential salary in the event such companies were acquired.

104.    MG Capital helped Sullivan find potential acquisitions.

105.    MG Capital provided Sullivan with potential acquisition leads.

106.    MG Capital provided Sullivan with access to contacts and intermediaries known to them to have acquisition leads.

107.    MG Capital worked with Sullivan to secure debt financing for potential acquisitions.

108.    Sullivan identified potential acquisitions through contacts, leads, and intermediaries known to Sullivan.

109.    Sullivan identified potential acquisitions through contacts, leads, and intermediaries known to MG Capital.

110.    Sullivan devoted a substantial amount of his working time to Joint Venture activities.

111.    On information and belief, Kodsi, Gracias, and MG Capital had an agreement among themselves to invest equally in companies purchased through MG Capital's efforts.

112.    On information and belief, Kodsi, Gracias, and MG Capital had oral agreements between themselves and other third-party individuals to find, and purchase mid-sized companies for investment under terms similar to the Joint Venture Agreement.

- 18 -

113. The Joint Venture Agreement did not provide for any specified duration of time, or any termination date or event.

114. Sullivan and MG Capital associated themselves as joint venturers.

115. Sullivan and MG Capital agreed to, and thereafter did hold a joint interest in the Joint Venture through their collective contributions of effort, skill, knowledge, financial resources, and business relationships; and their right and commitment to invest equally in purchasing companies. Sullivan contributed substantial management and deal experience to the Joint Venture which he gained over several years as a successful military officer, mergers and acquisition counsel for a public company, and General Manager of a public company; and through his educational experiences where he earned B.S., J.D., and M.B.A. degrees from top universities. At the time the Joint Venture Agreement was formed, MG Capital , Kodsi, and Gracias lacked similar degrees of experience and knowledge. Sullivan's background as an "operator" was intended to complement Kodsi and Gracias' experience as financiers thereby enhancing the reputation, credibility, and capabilities of the Joint Venture.

116. Sullivan and MG Capital expressly agreed, and thereafter did exercise joint control over the Joint Venture's activities

117. Sullivan and MG Capital expressly agreed to share in the profits and losses of the Joint Venture as follows:

    a.    Sullivan, Kodsi and Gracias would each contribute up to one-third of the equity capital required to purchase each company, and would thereafter share in the profits and losses of any acquired companies as shareholders.

    b.    Kodsi, Gracias, and MG Capital would pay for the overhead expenses incurred by the Partnership and would be reimbursed for these expenses through one-time management fees paid by each acquired company after it was acquired.

    c.    Sullivan would be employed by, and thereafter receive a salary from the first company acquired through the Partnership.

- 19 -

118. Sullivan complied with all of the terms and conditions of the Joint Venture Partnership Agreement.

119. Sullivan had a right under the Joint Venture Agreement to invest in the IPC Acquisition.

120. Sullivan is, and at all relevant times has been, ready, willing, and able to invest in the IPC Acquisition consistent with the terms of the Joint Venture Agreement.

121. MG Capital breached the Joint Venture Agreement by excluding Sullivan from investing in the IPC transaction. MG Capital also breached the Joint Venture Agreement by depriving Sullivan of a lucrative job and salary from IPC following the acquisition.

122. As a consequence of the foregoing breach, Sullivan suffered damages. On information and belief, those damages exceed $13 million.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and against the Defendant MG Capital on Count II in an amount to be proved at trial but not less than $13,000,000, plus costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

## COUNT III
### (Breach of Contract)
### (In the Alternative to Counts I and II)

123. Sullivan incorporates the allegations of Paragraphs 1 through 62 Paragraph 123 as if fully set forth herein.

124. Although Sullivan denies that MG Capital was ever a party to the Agreement, based on MG Capital's allegations and admissions, and in the alternative to Counts I and II, Sullivan alleges for purposes of this Count, that MG Capital was a party to the Agreement along with Sullivan, Kodsi, and Gracias.

125.    MG Capital breached the Agreement by excluding Sullivan from investing in the IPC transaction.  MG Capital breached the Agreement by depriving Sullivan of a lucrative job and salary from IPC following the acquisition.

126.    As a consequence of the foregoing breach, Sullivan suffered damages.  On information and belief, those damages exceed $13 million.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and against the Defendant MG Capital on Count III in an amount to be proved at trial but not less than $13,000,000, plus costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

### COUNT IV
### (Breach of Employment Contract)
### (In the Alternative to Counts I, II, and III)

127.    Sullivan incorporates the allegations of Paragraphs 1 through 62 as Paragraph 127 as if fully set forth herein.

128.    Although Sullivan denies that he was ever an MG Capital employee, based on MG Capital's allegations and in the alternative to Counts I, and II, Sullivan alleges for purposes of this Count, that Sullivan was an MG Capital employee.

129.    As part of his employment agreement, Sullivan was entitled to invest equally in any acquisitions which Sullivan identified, helped identify, or otherwise worked on with MG Capital.

130.    Sullivan identified, helped identify IPC, and otherwise worked on the IPC Acquisition.

131.    MG Capital breached the Agreement by excluding Sullivan from investing in the IPC transaction.  MG Capital also breached the Agreement by depriving Sullivan of a lucrative job and salary from IPC following the acquisition.

132.    As a consequence of the foregoing breach, Sullivan suffered damages. On information and belief, those damages exceed $13 million.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and against the Defendant MG Capital on Count IV in an amount to be proved at trial but not less than $13,000,000, plus costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

### COUNT V
### (Violation of the Wage Payment and Collection Act)
### (In the Alternative to Counts I, II, and III)

133.    Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count V of his Third Amended Complaint as Count V of his Fourth Amended Complaint as if fully set for herein.

### COUNT VI
### (Quantum Meruit)
### (In the Alternative to Counts I through V)

134.    Sullivan incorporates the allegations of Paragraphs 1 through 5, 12 through 14, 17 through 23, and 25 through 62 as Paragraph 134 as if fully set forth herein.

135.    Sullivan worked with Kodsi, Gracias, and MG Capital to find, and purchase mid-sized companies for investment from March 1997 to July 1998.

136.    Sullivan identified IPC as an acquisition candidate for MG Capital.

137.    Sullivan worked with Kodsi, Gracias, and MG Capital to acquire IPC.

138.    Kodsi, Gracias, and MG Capital benefitted from Sullivan's work in identifying IPC as an acquisition candidate and his work in helping them acquire IPC. Kodsi and Gracias, who were MG Capital's owners, ultimately purchased IPC (with other investors). IPC was a lucrative investment and Sullivan believes that Kodsi and Gracias' collective benefit from investing in IPC exceeds $26 million. Sullivan expected to be compensated for his work with

MG Capital on the IPC Acquisition. Sullivan had a reasonable expectation, based on industry custom and practice, that this compensation was to be in the form of a right to invest on a pro-rata basis with Kodsi and Gracias in acquiring IPC.

139. Kodsi, Gracias, and MG Capital was unjustly enriched by Sullivan's efforts and have unfairly retained such benefits to Sullivan's detriment.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and against the Defendants MG Capital, Kodsi, and Gracias on Count VI in an amount to be proved at trial but not less than $13,000,000, plus costs of suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VII
### (Breach of Fiduciary Duty)

140. Sullivan incorporates the allegations of Paragraphs 1 through 122 as Paragraph 140 as if fully set forth herein.

141. As alleged in Counts I and Counts II, Sullivan and Kodsi, Gracias, and MG Capital were either partners and that Sullivan and MG Capital were joint venturers.

142. As such, MG Capital and Kodsi owed Sullivan a fiduciary duty.

143. MG Capital and Kodsi breached their fiduciary duties to Sullivan by knowingly making false statements to him, intentionally concealing material information from him about the IPC Acquisition, and willfully excluding him from the IPC Acquisition in contravention of the Agreement.

144. Kodsi, Gracias, and MG Capital benefitted from their wrongful acts at Sullivan's expense by obtaining a greater ownership interest in IPC than they were entitled to under the Agreement.

145. As a result of Kodsi's and MG Capital's willful, wanton, and oppressive conduct, Sullivan is entitled to punitive damages.

- 23 -

*163*    146.    As a result of Kodsi and MG Capital's willful and wanton breach of fiduciary

duty, Sullivan was deprived of an extremely valuable investment and suffered damages which,

on information and belief, exceed $13 million.

WHEREFORE, Plaintiff Sullivan requests that this Court enter judgment in his favor and

against the Defendants MG Capital and Kodsi on Count VII in an amount to be proved at trial

but not less than $13,000,000, plus punitive damages of not less than $3,000,000, plus costs of

suit, prejudgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VIII
### (Tortious Interference With Contract)

147.    Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963),

Sullivan incorporates Count VIII of his Third Amended Complaint as Count VIII of his Fourth

Amended Complaint as if fully set for herein.

## COUNT IX
### (Fraudulent Transfer)

148.    Sullivan incorporates Paragraphs 1 through 5 as Paragraph 148 as if fully set forth

herein.

149.    In or about January 1998, Kodsi formed GAMCREFK insulate Kodsi's

investments from any business activities that Kodsi was involved with.

150.    Thereafter, Kodsi transferred all or substantially all of his assets, excluding his

interest in Connector Service Corporation, to GAMCREFK.

151.    In June 2000, Kodsi transferred his ownership interest in Connector Service

Corporation to GAMCREFK (the "GAMCREFK Transfer").  The estimated value of the

company was $57 million.

152.    In December 1998, Judge Leinenweber's found in Connector Service Corp. v. Jeffrey Briggs, Case No. 97 C. 7088, Northern District of Illinois, Eastern Division, that Kodsi's interest in Connector Service Corporation exceeded $14 million.

153.    In February 2001, GAMCREFK received $20 million for its interest in Connector Service Corporation.

154.    In January 2001, Kodsi claimed that his net worth was approximately $150,000.

155.    Kodsi retains control of and benefits from the assets of the GAMCREFK Trust. Specifically:

   a.    On information and belief, Kodsi used GAMCREFK's assets to pay a judgment against Kodsi in favor of the Securities and Exchange Commission for insider trading;

   b.    Kodsi continued and continues to direct MG Capital's business affairs to his personal benefit even though GAMCREFK and not Kodsi has been the member and manager of MG Capital;

   c.    Kodsi has directed and continues to direct MG Capital's litigation efforts to benefit Kodsi even though GAMCREFK and not Kodsi is the member and manager of MG Capital;

   d.    Kodsi settled GAMCREFK and dictated who the beneficiaries were and under what circumstances the beneficiaries would benefit from the trust; and

   e.    Kodsi has retained the power of appointment over the trustee of the GAMCREFK thereby maintaining control over the management of GAMCREFK.

156.    GAMCREFK knew that Kodsi was transferring his assets into the trust for the purpose of sheltering his assets from his creditors and knew of Sullivan's suit at the time of the GAMCREFK Transfer.  Thus, GAMCREFK has actively conspired with Kodsi to defraud his creditors by receiving Kodsi's assets when GAMCREFK knew that the transfers were making Kodsi insolvent or judgment proof.

157.    Sullivan sued Kodsi before the GAMCREFK Transfer.

158. The amount Sullivan claims in this suit exceeds Kodsi's net worth.

159. The GAMCREFK Transfer constituted all or substantially all of Kodsi's assets;

160. The GAMCREFK Transfer was made without Kodsi receiving a reasonably equivalent value in exchange for the transfer.

161. Kodsi was insolvent or became insolvent shortly after the GAMCREFK Transfer was made.

162. Kodsi caused the GAMCREFK Transfer with the actual intent to hinder, delay, or defraud Kodsi's creditors including Sullivan. Specifically, Kodsi has admitted that he caused the GAMCREFK Transfer in order to "insulate Kodsi's investments from any business activities that Kodsi was involved with."

163. The amount that Sullivan has requested in this suit far exceeded Kodsi's net worth. Accordingly, Kodsi believed or reasonably should have believed that hew would incur debts beyond his ability to pay as they became due.

164. Kodsi's transfer of his assets to GAMCREFK, including, but not limited to, the GAMCREFK Transfer was made in violation of Section 5 of the Illinois Uniform Fraudulent Transfers Act. 740 ILCS 160/5.

WHEREFORE, Sullivan requests that this Court enter judgment in his favor and against Kodsi and GAMCREFK on Count IX, and:

a. Avoid the transfers to the extent necessary to satisfy any judgment obtained by Sullivan;

b. Add additional parties as are necessary for complete relief;

c. Order that the property transferred be attached to satisfy any judgment obtained by Sullivan;

d. Enter an injunction prohibiting Kodsi and GAMCREFK from further disposition of the assets transferred;

e. Appoint a receiver to take possession of the transferred assets; and

f.       Award Sullivan his costs of suit and such other and further relief as the Court deems just and proper.

## COUNT X
### (Fraudulent Transfer)

165.    Sullivan incorporates Paragraphs 1 through 5 as Paragraph 165 as if fully set forth herein.

166.    In or about January 1998, Kodsi formed GAMCREFK insulate Kodsi's investments from any business activities that Kodsi was involved with.

167.    Thereafter, Kodsi transferred all or substantially all of his assets, excluding his interest in Connector Service Corporation, to GAMCREFK.

168.    In June 2000, Kodsi transferred his ownership interest in Connector Service Corporation to GAMCREFK (the "GAMCREFK Transfer"). The estimated value of the company was $57 million.

169.    In December 1998, Judge Leinenweber's found in Connector Service Corp. v. Jeffrey Briggs, Case No. 97 C. 7088, Northern District of Illinois, Eastern Division, that Kodsi's interest in Connector Service Corporation exceeded $14 million.

170.    In February 2001, GAMCREFK received $20 million for its interest in Connector Service Corporation.

171.    In January 2001, Kodsi claimed that his net worth was approximately $150,000.

172.    Sullivan had sued Kodsi before the GAMCREFK Transfer.

173.    The amount Sullivan claims in this suit exceeds Kodsi's net worth.

174.    The GAMCREFK Transfer constituted all or substantially all of Kodsi's assets;

175.    The GAMCREFK Transfer was made without Kodsi receiving a reasonably equivalent value in exchange for the transfer.

X   176.    The amount that Sullivan has requested in this suit exceeded Kodsi's net worth. Kodsi was insolvent or became insolvent shortly after the GAMCREFK Transfer was made.

X   177.    Kodsi's transfer of his assets to GAMCREFK, including, but not limited to, the GAMCREFK Transfer was made in violation of Section 6 of the Illinois Uniform Fraudulent Transfers Act.  740 ILCS 160/6.

WHEREFORE, Sullivan requests that this Court enter judgment in his favor and against Kodsi and GAMCREFK on Count X, and:

a.    Avoid the transfers to the extent necessary to satisfy any judgment obtained by Sullivan;

b.    Add additional parties as are necessary for complete relief;

c.    Order that the property transferred be attached to satisfy any judgment obtained by Sullivan;

d.    Enter an injunction prohibiting Kodsi and Gracias from further disposition of the assets transferred;

e.    Appoint a receiver to take possession of the transferred assets; and

f.    Award Sullivan his costs of suit and such other and further relief as the Court deems just and proper.

## COUNT XI
### (Piercing the Corporate Veil)

2°4   178.    Sullivan incorporates the allegations of Paragraphs 1 through 5 as Paragraph 178 as if fully set forth herein.

2°5   179.    There is a unity of interest and ownership between Kodsi, Gracias, MG Capital, and AMAX, such that Kodsi, Gracias, MG Capital, and AMAX are alter egos of one another.

2°6   180.    Between February 1998 and August 1998, Kodsi and Gracias were the sole members and/or managers of MG Capital (either directly or through other entities that they owned or controlled).

181.    Between February 1998 and August 1998, Kodsi and Gracias were the sole shareholders or the controlling shareholders of AMAX or AMAX's parent corporation, CSC.

182.    Between February 1998 and August 1998, Kodsi and Gracias exerted total control over the affairs of both MG Capital and AMAX.

183.    Between February 1998 and August 1998, the corporate addresses for MG Capital AMAX, and CSC were the same addresses even though MG Capital and AMAX are in different businesses and neither company has ever owned any shares in the other.

184.    According to Kodsi and Gracias sworn testimony, MG Capital's employees were commonly paid by AMAX, and not by MG Capital.

185.    According to Kodsi and Gracias' sworn testimony, MG Capital's employees commonly received benefits such as bonuses and health insurance from AMAX, and not from MG Capital.

186.    MG Capital's alleged employees, including the MG Capital employees paid by AMAX, work for the personal benefit of Kodsi and Gracias and not for the benefit of MG Capital.

187.    AMAX has paid substantial expenses incurred by Kodsi and Gracias that had no business benefit for AMAX.

188.    MG Capital, Kodsi, and Gracias commingle assets.  For example, in their now dismissed Counterclaim, Kodsi and Gracias allege ownership to the very same trade secrets, confidential information, and proprietary information that MG Capital has alleged that it owns exclusively.

189.    Although MG Capital is alleged to be in the "business of acquiring and operating medium-sized manufacturing companies for investment," from its inception until August 1998, MG Capital had never acquired or operated any company.  Instead, MG Capital signs letter of

intent agreements to purchase companies, but Kodsi and Gracias, or entities they own and/or control actually purchase the companies thus bypassing MG Capital.

190.    For example, in February 1998, MG Capital signed a letter of intent to purchase IPC (referred to above).  In June of 1998, Kodsi and Gracias formed Industrial Powder Coatings Acquisition Corp. ("IPCAC").  Gracias was a 40% shareholder in IPCAC, a trust settled by Kodsi was a 40% shareholder, and the remaining 20% was owned by Kodsi and Gracias' friends, family members, and business associates. On or about June 15, 1998, while the letter of intent agreement between MG Capital and the owner(s) of IPC was still in effect, IPCAC, and not MG Capital, purchased IPC.  MG Capital has never owned any interest in IPCAC or IPC.

191.    In sworn testimony, Kodsi stated that MG Capital is a "vehicle" for he and Gracias to make certain investments as individuals.

192.    In sworn statements, Kodsi and Gracias admit that they used MG Capital to carry out their prior efforts to find and acquire companies.

193.    MG Capital does not comply with corporate formalities.  For example, MG Capital never filed annual reports on time for 1998, 1999, and 2000.  MG Capital's authority to do business in Illinois was revoked on October 29, 1998.  In order to file its Counterclaim against Sullivan in the State Case, MG Capital finally submitted late annual reports in January 2001, paid a fine, and had its authority to do business in Illinois reinstated.

194.    On information and belief, MG Capital has never provided workers' compensation or unemployment insurance for any of its alleged employees.

195.    Because Kodsi and GAMCREFK (and other investors) invest personally in all MG Capital deals, MG Capital is deprived of business opportunities which would provide it with income and tangible assets.  Thus, on information and belief, MG Capital is not operated for

profit due to its members' self dealing, and is undercapitalized for the business it alleges to engage in.

2 22 196.    Accordingly, there is no separate personality between Kodsi, GAMCREFK, and MG Capital, and adherence to the fiction that Kodsi, GAMCREFK, and MG Capital have separate existences would sanction a fraud, promote injustice, and produce inequitable results.

WHEREFORE, Sullivan requests that this Court enter judgment in his favor and against MG Capital, GAMCREFK, and Kodsi on Count XI finding that the corporate veil between MG Capital, GAMCREFK, and Kodsi should be pierced and that MG Capital, Kodsi, GAMCREFK, are liable for any judgment Sullivan might obtain.

## COUNT XII

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count II of his First Amended Complaint as Count XII of his Fourth Amended Complaint as if fully set for herein.

## COUNT XIII

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count III of his First Amended Complaint as Count XIII of his Fourth Amended Complaint as if fully set for herein.

## COUNT XIV

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count IV of his First Amended Complaint as Count XIV of his Fourth Amended Complaint as if fully set for herein.

**COUNT XV**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count V of his First Amended Complaint as Count XV of his Fourth Amended Complaint as if fully set for herein.

**COUNT XVI**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count VI of his First Amended Complaint as Count XVI of his Fourth Amended Complaint as if fully set for herein.

**COUNT XVII**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count IX of his First Amended Complaint as Count XVII of his Fourth Amended Complaint as if fully set for herein.

**COUNT XVIII**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count X of his First Amended Complaint as Count XVII of his Fourth Amended Complaint as if fully set for herein.

**COUNT XIX**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count XI of his First Amended Complaint as Count XIX of his Fourth Amended Complaint as if fully set for herein.

**COUNT XX**

Pursuant to <u>Bowman v. County of Lake,</u> 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count XII of his First Amended Complaint as Count XX of his Fourth Amended Complaint as if fully set for herein.

## COUNT XXI

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count XIII of his First Amended Complaint as Count XXI of his Fourth Amended Complaint as if fully set for herein.

## COUNT XXII

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count XIV of his First Amended Complaint as Count XXII of his Fourth Amended Complaint as if fully set for herein.

## COUNT XXIII

Pursuant to <u>Bowman v. County of Lake</u>, 29 Ill. 2d 268, 193 N.E.2d 833 (1963), Sullivan incorporates Count XV of his First Amended Complaint as Count XXIII of his Fourth Amended Complaint as if fully set for herein.

BRIAN T. SULLIVAN,

By: _____
One of His Attorneys

David H. Latham
Law Offices of David H. Latham
150 North Wacker Drive
Suite 1400
Chicago, Illinois  60606
(312) 782-1910
Atty No.: 34878

- 33 -