Page 281

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION
 3   MG CAPITAL LLC, a Delaware    )
     limited liability company,    )
 4                                 )
                 Plaintiff,        )
 5                                 )
         vs.                       )
 6                                 )   No. 01 C 5815
     BRIAN T. SULLIVAN and         )   Judge John W. Darrah
 7   THE SULLIVAN COMPANIES, an    )
     Illinois corporation,         )
 8                                 )
                 Defendants.       )
 9   BRIAN T. SULLIVAN,            )
                                   )
10               Counterplaintiff, )
                                   )
11       vs.                       )
                                   )
12   MG CAPITAL LLC, a Delaware    )
     limited liability company,    )
13                                 )
                 Counterdefendant, )
14                                 )
         and                       )
15                                 )
     ALAIN KODSI, ANTONIO GRACIAS, )
16   and AMAX PLATING, INC.,       )
     an Illinois corporation,      )
17                                 )
                 Defendants.       )
18
19                         VOLUME II
20                   CONTINUED DEPOSITION OF
21                     ALAIN DAMIAN KODSI
                    WEDNESDAY, APRIL 24, 2002
22
23
24
```

Page 282

```
 1   STATE OF ILLINOIS )
                      ) SS:
 2   COUNTY OF C O O K )
 3   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT - LAW DIVISION
 4
 5   BRIAN T. SULLIVAN,    )
          Plaintiff,       )
 6                         )
       vs.                 ) No. 00 L 1973
 7                         ) Judge Allen S. Goldberg
     ALAIN KODSI, et al.,  )
 8                         )
          Defendants.      )
 9
10
11      The continued deposition of ALAIN DAMIAN
12   KODSI, taken pursuant to notice and in accordance with
13   the applicable rules pertaining to the taking of
14   depositions, taken before JULIA MIRANDA, CSR, License
15   No. 084-003166, a notary public within and for the
16   County of Cook and State of Illinois, at 300 West
17   Washington Street, 14th Floor Conference Room, Chicago,
18   Illinois, on Wednesday, April 24, 2002, commencing at
19   the hour of 8:32 a.m.
```

Page 283

```
     APPEARANCES:

        Mr. David H. Latham
        Law Offices of David H. Latham
        300 West Washington Street
        Suite 1118
        Chicago, Illinois 60606
        (312) 782-1910

           on behalf of Brian T. Sullivan and
           The Sullivan Companies;

        Mr. Thomas K. Cauley, Jr.
        Sidley, Austin, Brown & Wood
        Bank One Plaza
        10 South Dearborn Street
        Chicago, Illinois 60603
        (312) 853-7520
           on behalf of Alain Kodsi,
           MG Capital LLC, Antonio Gracias and
           Amax Plating, Inc.

     ALSO PRESENT:
        Mr. Brian T. Sullivan
```

Page 284

```
                    INDEX
     WITNESS                              PAGE
     ALAIN DAMIAN KODSI

       Examination (Continued)
         By Mr. Latham                    285
       Examination
         By Mr. Cauley                    385
       Further Examination
         By Mr. Latham                    386

                         MARKED FOR
     PLAINTIFF'S DEPOSITION EXHIBITS      IDENTIFICATION
       No. 42..................290
       No. 43..................307
       No. 44..................312
       No. 45..................313
       No. 46..................314
       No. 47..................324
       No. 48..................328
       No. 49..................331
       No. 50..................333
       No. 51..................367
       No. 52..................367
       No. 53..................368
       No. 54..................369
       No. 55..................373
       No. 56..................384
```

Page 285

```
 1           ALAIN DAMIAN KODSI,
 2   called as a witness herein, having been previously duly
 3   sworn, was examined and testified further as follows:
 4                 EXAMINATION
 5                 (Continued)
 6   BY MR. LATHAM:
 7      Q   Mr. Kodsi, this is the continuing
 8   deposition from yesterday.
 9          You understand you're still under oath?
10      A   Yes.
11      MR. LATHAM: Is that acceptable, Tom, or should we
12   re-swear him?
13      MR. CAULEY: I think it's perfectly fine. He
14   understands he's under oath.
15   BY MR. LATHAM:
16      Q   IPC was purchased by IPCAC, Industrial
17   Powder Coating Acquisition Corp.; is that correct?
18      A   I believe so.
19      Q   Okay. Why didn't MG Capital purchase IPC?
20      A   We were advised by our attorneys on the
21   corporate structure.
22      Q   Without disclosing specific communications,
23   but can you give me the reasons why?
24      MR. CAULEY: Well, and I admonish you not to say
```

Page 286

```
 1   anything you learned from your lawyers. If you learned
 2   it for some reason outside of what was communicated
 3   directly to you by your lawyers --
 4      MR. LATHAM: I'm not asking for the reasons they
 5   gave you.
 6          What are the reasons you considered?
 7      MR. CAULEY: Okay. If you can answer that
 8   question without violating attorney/client privilege,
 9   go ahead and do so. I guess what I'm saying, if the
10   only reasons you had are because your lawyers told you
11   it was a good idea, then I don't know that you can
12   answer the question.
13      MR. CAULEY: Do you want to go out in the hall?
14      MR. LATHAM: Sure. That's fine.
15      THE WITNESS: I'm sorry.
16      MR. LATHAM: And, Tom, I don't think his thought
17   process --
18      MR. CAULEY: Well, if his thought process is only
19   what the lawyers told him -- well, let me...
20          (A brief pause.)
21      MR. CAULEY: Go ahead.
22      THE WITNESS: Some of the reasons would be to --
23   dealing with issues of cross guarantees between
24   different business entities, having the business be,
```

Page 287

```
 1   you know, independent. You know, any issues that arose
 2   with other businesses that were owned by shareholders
 3   of MG Capital wouldn't -- you know, wouldn't be
 4   impacted by any negative issues associated with this
 5   company.
 6   BY MR. LATHAM:
 7      Q   Cross guarantees, who gave cross guarantees?
 8      A   Nobody did.
 9      Q   What are cross guarantees?
10      A   To my understanding, if you own -- if you
11   own different assets, a lender could ask that you
12   provide assurances, guarantees that include the assets
13   of other businesses or other assets to support the loan
14   that's being made at a new entity.
15      Q   So if they could have requested -- it could
16   have put MG Capital's other assets at risk?
17      A   Right. And then there were -- and then
18   there were also issues of, you know, different
19   ownership structure.
20      Q   You mentioned also -- what was the second --
21   it had something having to do with independent. We can
22   read back your answer but --
23      A   I'm not sure what I said.
24      MR. LATHAM: Okay. Could you read back his answer
```

Page 288

1  because all I got was independent. I'm a slow writer.
2       (The record was read.)
3  BY MR. LATHAM:
4       Q   One of the reasons was that if there were
5  disputes or issues with respect to MG Capital's other
6  businesses or something, it would put IPC at risk?
7       MR. CAULEY: I think he said the reverse.
8       THE WITNESS: No. What I was referring to in
9  that statement was to not have to have any cross
10 guarantees from other assets with IPC, to keep it as --
11 keep the guarantees independent to IPC.
12 BY MR. LATHAM:
13      Q   What about in the event of a suit against MG
14 Capital, would this have -- purchasing the stocks
15 with IPCAC have protected those assets?
16      MR. CAULEY: Objection to form.
17      THE WITNESS: You know, I'd have to talk to --
18 I'd have to ask the lawyers.
19 BY MR. LATHAM:
20      Q   Has MG Capital LLC ever purchased a company?
21      A   I believe it has.
22      Q   Which one?
23      A   I believe a company -- I believe --
24 actually, I don't know that it purchased a company.

Page 289

1       Q   Directly?
2       A   Yeah. I'm not sure. I'm not sure. I'd
3  have to ask the lawyers to -- exactly.
4       Q   What about Overland-Bolling?
5       A   I'm not sure. I'm not sure if it was MG
6  Capital or if it was Overland-Bolling Acquisition
7  Corp. I'd have to look at the documents.
8       Q   In the deals Brian was working on, what was
9  your understanding of who would be the investors in the
10 deals?
11      A   My understanding would be that it would be
12 Antonio Gracias, myself, and Brian Sullivan as the --
13 as the equity investor.
14      Q   Not MG Capital LLC?
15      A   No, not MG Capital LLC.
16      Q   IPCAC was an S corp?
17      A   You know, I don't want to say I think so. I
18 need to look at the documents. I believe it was, yes.
19 I mean, I strongly believe it was.
20      MR. CAULEY: Saying I believe it was is not much
21 different than saying I think so.
22      THE WITNESS: I'm pretty sure it was, but I'm
23 not -- okay. I need to look -- I would need to look at
24 all of these documents in order to accurately answer.

Page 290

1       (Document marked Plaintiff's
2        Deposition Exhibit No. 42.)
3  BY MR. LATHAM:
4       Q   Does that refresh your recollection as to
5  whether it was an S corp?
6       A   Well, this would indicate it would be an S
7  corp, but I'm not sure that that was the eventual form
8  it took.
9       Q   Okay. Do you know what documents you would
10 look at to --
11      A   The incorporation documents.
12      Q   Incorporation documents.
13      Who is Rudolfo Luzardo?
14      A   He's a former employee of MG Capital.
15      Q   When did he become an employee?
16      A   I'd have to look at the -- I would need to
17 look at documents. I'm not sure of the day.
18      Q   Did he work at IPC?
19      A   He did.
20      Q   What did he do there?
21      A   He did a little bit of everything,
22 specifically working in the finance area. He had the
23 title of chief financial officer of IPC, I believe.
24      Q   Do you know what his employment background

Page 291

1  is?
2       A   I do, some of it, not all of it.
3       Q   What is it? To your knowledge, what is his
4  employment background?
5       A   JP Morgan, Merrill Lynch, and MG Capital and
6  IPC. IPC, MG Capital, JP Morgan, Merrill Lynch.
7       Q   Do you know if he's ever been a CFO at
8  another company?
9       A   I don't.
10      Q   Why was he brought in to be the CFO?
11      A   I actually don't -- I don't know that he had
12 the title of CFO at the company initially. There was a
13 big hole on the finance side at IPC.
14      Q   Was he brought in shortly after you
15 purchased IPC?
16      A   He had already done work. Yes, I would say
17 that that's correct. I would say, yes, shortly after.
18      Q   Did he work on the deal before you purchased
19 it?
20      A   I don't remember. I would say it was
21 shortly after we purchased it.
22      Q   Who from the MG Capital side worked on the
23 IPC deal?
24      A   Myself, Antonio Gracias, Tom Horak, Dan

Page 292

1  Barlow. I think that those are the main people.
2       Q   What did you -- were you able to increase
3  the -- after the purchase of IPC, was the financial
4  performance of IPC improved or enhanced?
5       A   It was.
6       Q   What was its EBITDA at the time you
7  purchased it?
8       A   I would need to look at -- I'm not sure.
9       Q   By what percentage did that increase, do
10 you know?
11      A   I would need the starting number and the
12 finishing number.
13      Q   What did you do -- what was done to increase
14 the financial performance? Was it simply a matter of
15 the market, or was it things you did?
16      A   No. I mean, we undertook a major
17 restructuring of the company. And I believe that -- I
18 believe that almost -- I mean, the company was actually
19 having, you know, a very tough time when we acquired
20 it. And we had to layoff or terminate I think almost
21 100 individuals. I'm not sure if it was 100, but a
22 very large number of individuals at the company.
23      We had to, you know, recruit a -- we had to
24 bring the operator from the Mexican operations up to

Page 293

1  the states to work with Antonio on the operations
2  side. We had to -- the facilities themselves were in
3  very bad shape. You know, we had to do a tremendous
4  amount of house cleaning. We had to fix the lines. We
5  had to -- I mean, we had to fix really every aspect of
6  the company. The company had no computers to speak
7  of. Things were being done by hand on the purchase
8  side. You know, I mean, just literally every facet of
9  the business had to be restructured.
10      In addition, we walked into a very -- a
11 very, very bad labor situation at the company. The
12 company's union was extremely hostile and bitter
13 towards the previous owners of the business. Their
14 union contract was expiring in September, and they were
15 threatening -- they were threatening to strike. If
16 they had -- if they had done that, I don't think
17 there's any question that the company would have gone
18 bankrupt.
19      You know, I personally spent, you know,
20 probably every day during the month of -- from the time
21 we closed through, you know, the middle of July to
22 get -- to meet with --
23      (A brief interruption.)
24      THE WITNESS: I apologize.

**Page 294**

1  You know, making presentations to all
2  the employees in individual shifts. We made
3  presentations in both Spanish and in English. We made
4  presentations in small groups. We made presentations
5  on and off the job site. I made those presentations in
6  24-hour shifts for, you know, days at a time, sleeping
7  only a couple of hours at a time. You know, I was
8  very -- I mean, it was an unbelievable mess when we got
9  there.
10 BY MR. LATHAM:
11     Q   Did you increase both sales -- did you
12 increase sales?
13     A   Our focus was -- we didn't really have a
14 chance to focus on sales. We focused on the union, and
15 we focused on the operations, and we focused on the
16 management structure. Those were the points that we
17 had a chance to focus on.
18     Q   So did you reduce costs?
19     A   I think we did reduce cost.
20     Q   Both from an expenditure level and from an
21 efficiency level?
22     MR. CAULEY: Objection to form.
23     THE WITNESS: I think that we made very, very
24 significant improvements in efficiency. I mean,

**Page 295**

1  Antonio in particular had a -- Antonio was the CEO of
2  Connector Service Corporation. He'd spent a tremendous
3  amount time in the businesses in our coatings business
4  at EPS and Amax. And everything that he had learned
5  and implemented there, he brought to IPC. And he did
6  a -- he did a great job doing that, and he was a CEO of
7  IPC.
8  BY MR. LATHAM:
9      Q   Were the areas you addressed in terms of
10 needing improvement or making change, were those issues
11 that came up during due diligence?
12     A   Some of the issues came up during due
13 diligence.
14     Q   Can you tell me which ones?
15     A   I can't specifically. I can't
16 specifically. I don't remember exactly.
17     Q   Prior to the time you negotiated the LOI, do
18 you recall any concerns you had for the business?
19     A   Well, we had a lot of concerns because
20 Internet prevented us from interviewing employees at
21 the company. They only permitted us to talk to a
22 couple of individuals at the business.
23     Q   Right.
24     A   And that was very anxiety provoking, because

**Page 296**

1  we knew that there was a union. We knew that there
2  were issues. We didn't know the level of animosity and
3  problems that existed. And Internet had made it a
4  condition that we not be permitted to interview in
5  detail any of the workers.
6      Q   Do you recall any other issues you had prior
7  to the time you negotiated the letter of intent?
8      A   There were a lot of issues. I mean, we had
9  to -- I mean, when you talk about issues, I'm not sure
10 what you mean by issues.
11     Q   Well, questions.
12     A   About?
13     Q   IPC. And I'm talking about prior to the
14 time you negotiated the letter of intent.
15     A   Oh, prior to the time we negotiated the
16 letter of intent, I don't remember. I don't remember
17 specifically before the letter of intent or after the
18 letter of intent.
19     Q   Okay. Other than the union, what other
20 issues did you have at any time prior to purchasing
21 IPC?
22     MR. CAULEY: Objection to form.
23     THE WITNESS: I think that we saw that there were
24 a lot of operating issues at the company that we had

**Page 297**

1  seen by doing plant tours.
2  BY MR. LATHAM:
3      Q   What do you mean by operating issues?
4      A   The lines weren't running properly, or we
5  thought that they were not running as well as they
6  could. I mean, we thought that the physical plants
7  were actually dangerous. They had, you know, tons of
8  material stacked up in sort of makeshift ways that
9  was -- the corridors were not -- I mean, it was
10 difficult to walk around even in some of the plants.
11 They were very dark. They were dirty. The cafeteria
12 facilities were, you know, were disgusting. The
13 bathrooms were disgusting. The racks were -- a lot of
14 them were broken that held parts up. The equipment --
15 monitoring equipment that we saw was not even hooked
16 up.
17     When we took our plant tours, you know, we
18 saw -- I mean, we just saw tremendous number of issues
19 in the operations. And Antonio more than I had saw
20 those issues, but we both saw them. And the company
21 was in very bad shape. I mean, it was in very bad
22 shape. It was one of the reasons Internet wanted to
23 get rid of it.
24     Q   Very bad shape, what do you mean by that?

**Page 298**

1      A   Well, it became clear after we bought the
2  business that the union was incredibly hostile and
3  angry and was articulating that they were going to vote
4  to strike, which would have shut down the business,
5  which would have resulted in a loss of all the major
6  clients of the business, both Ford and Chrysler.
7      IPC was in the supply chain for Ford and for
8  Chrysler and for all of its clients. One of Ford's
9  facilities would manufacture the part. They would come
10 to IPC to be coated. They would then go to another
11 facility for assembly. They were just in kind of
12 operations.
13     So if IPC shut down, Ford or any client
14 would not just say, okay, great. Let's wait until you
15 get opened again. They would take all their business
16 somewhere else. And all of clients that I had spoken
17 with had indicated that they were going to be pulling
18 the business prior to the union deadline.
19     Because three years before, they had a
20 similar issue when the union was not as upset with the
21 company. And the union effectively voted at the
22 last -- you know, at midnight of the last day, the
23 result of that was that we learned after we bought the
24 company was that -- that Ford as an example had 50

**Page 299**

1  trucks lined up in front of the facility to take away
2  all its part to bring to other suppliers.
3      And the clients were very clear with us that
4  they would not go through that again with IPC. That
5  we -- we would have to have it resolved and we would
6  lose their business, and we'd probably lose their
7  business permanently.
8      Q   Eventually you put IPC up for sale?
9      A   Yes, we did.
10     Q   When?
11     A   I would say that the sales process probably
12 began in July of '99, something along those lines.
13     Q   Why?
14     A   Why? We thought it was a good idea to try
15 and return money that the investors had put in.
16     Q   Were you looking to sell 100 percent of the
17 business or a part of the business?
18     A   We were unclear as to what we would do. We
19 were exploring opportunities.
20     Q   Was Nesbitt Burns involved?
21     A   Yes, they were hired.
22     Q   As what?
23     A   As investment bank.
24     Q   Did they provide a valuation of the

Page 300

```
 1  business?
 2    A   No, they did not provide a valuation of the
 3  business.
 4    Q   Did they provide an opinion as to the value
 5  of the business?
 6    A   You know, they might have after -- they
 7  might have. I don't know. I don't know.
 8    Q   What price were you looking to sell the
 9  business at?
10    A   The highest possible price the market would
11  bear.
12    Q   Did you have any idea what that would be?
13    A   Honestly, when we began, I can't remember
14  that I did.
15    Q   At some point did you come to some
16  conclusion as to what the value of the business was?
17    A   I think the day that it sold.
18    Q   Did you receive offers?
19    A   We did.
20    Q   Did you reject those offers?
21    A   We selected the one that we thought was the
22  best.
23    Q   In terms of price?
24    A   I don't remember specifically what the
```

Page 301

```
 1  offers were.
 2    Q   Was Valuecrest one of the bidders?
 3    A   I don't remember. Nesbitt Burns conducted
 4  the process.
 5    Q   It was sold to Hampshire Equity Partners?
 6    A   Yes, it was.
 7    Q   Can you tell me how that deal was
 8  structured?
 9    A   Well, it wasn't sold. It was -- they did a
10  recapitalization of the business.
11    Q   Okay. What is a recapitalization?
12    A   They -- what is a recap? They put money
13  into the business. They bought some of the equity out
14  of the business.
15    Q   What was the money -- the money that was put
16  into the business, how was that used?
17    A   For -- you know, I would have to look -- I
18  don't know specifically after the date of the
19  restructuring.
20    Q   Was part of it used to pay off existing
21  debt?
22    A   I would have to look at the closing
23  documents. I'm not sure that it was used to pay off
24  the closing existing debt. Or actually a new line of
```

Page 302

```
 1  debt was put in place with the same -- with our
 2  existing lender, and I believe our debt levels
 3  increased. So I don't believe that that was paid down
 4  on the senior lender side; but senior debt,
 5  subordinated debt was paid off.
 6    Q   Okay. They purchase 51 percent of the
 7  equity?
 8    A   Yes, they did.
 9    Q   Do you know how much was paid for that
10  equity?
11    A   The specific dollar amount, I'm not sure.
12    Q   Was there a premium paid for a majority?
13  MR. CAULEY: Objection; calls for speculation.
14  THE WITNESS: I'm not sure.
15  BY MR. LATHAM:
16    Q   Is there any way you could find out whether
17  or not a premium was paid?
18  MR. CAULEY: Objection, calls for speculation.
19  THE WITNESS: I'm not sure what you mean by
20  premium. I don't know what you're --
21  BY MR. LATHAM:
22    Q   Well, you value the company at $100. You
23  want to pay 51 percent, you pay $60 for it.
24    A   I'm sorry. Go through that example again
```

Page 303

```
 1  one more time.
 2    Q   If a company is worth $100, and you're
 3  buying 51 percent, that would be $51. But if you pay a
 4  premium, you pay say $60.
 5    A   I don't know how Hampshire -- I don't know
 6  how Hampshire valued what they were buying. I was not
 7  privy to their -- how they analyze the business.
 8    Q   Do you know if all the money -- was any
 9  portion of the equity purchase price held back?
10    A   Yes.
11    Q   How much?
12    A   I think approximately 1.5 million in cash
13  and then some stock.
14    Q   Okay. Where did the stock come from? And
15  by that I mean, did they have rights to additional
16  stock other than the 51 percent or --
17    A   They did under certain provisions.
18    Q   Okay. So if certain -- if certain
19  conditions happened, they would get more than the
20  51 percent?
21    A   Yes.
22    Q   Okay. Did those conditions happen?
23    A   Some of them did, yes.
24    Q   Okay. How much of the equity does Hampshire
```

Page 304

```
 1  own today?
 2    A   I think well in excess of 90 percent.
 3    Q   90 percent?
 4    A   Well in excess, I think. I'm not sure. You
 5  know, I'm not sure. I'm not sure. You'd have to ask
 6  Hampshire.
 7    Q   And the original deal was 51 percent.
 8        How did they get the additional equity, to
 9  your knowledge?
10  MR. CAULEY: Did they get additional equity? I
11  mean, do you know?
12  THE WITNESS: Yeah.
13  MR. CAULEY: Okay.
14  THE WITNESS: I don't know the specific amount of
15  equity that they got, but they got equity. They got
16  shares that were held in escrow. They retained those,
17  and they had to put additional money into the business
18  because the business wasn't doing well. So they got
19  additional shares as a result of doing that. Those are
20  the two primary ways.
21  BY MR. LATHAM:
22    Q   At a million five?
23    A   They received a million two of that, of
24  those funds.
```

Page 305

```
 1    Q   So an additional 300,000 was paid out to
 2  shareholders?
 3    A   Yes.
 4    Q   Now, you and Antonio owned 80 percent. At
 5  the point -- did you and Antonio get 80 percent of the
 6  300,000 or was --
 7    A   I actually did not own --
 8    Q   I understand that GAMCREFK Trust owned it.
 9    A   Yes.
10    Q   Did GAMCREFK Trust get 40 percent of the
11  300,000, or did it get half?
12    A   Oh, it didn't receive any of the funds.
13    Q   So who did the 300,000 go to?
14    A   To the shareholders other than Antonio
15  Gracias or the GAMCREFK Trust.
16    Q   The original minority shareholders?
17    A   Yes.
18    Q   And was the million five that was held in
19  escrow all money that was earmarked for the original
20  minority shareholders, to your knowledge?
21    A   No. It was earmarked for all shareholders.
22    Q   Then why didn't you and Antonio or your
23  trust get that, get your percentage of the 300,000?
24    A   Hampshire had claims on the escrow.
```

Page 306

1  Q  Okay.
2  A  And in order to settle the claims quickly
3  and efficiently, we agreed to a resolution by which
4  they would -- they would keep all the shares owned by
5  Antonio Gracias, the GAMCREFK Trust, and all of the
6  money that would have gone to the GAMCREFK Trust and
7  Antonio Gracias. And we distributed the balance of the
8  shares and equity that all the other shareholders got
9  in pro rata. And I'm not sure that it's 300,000 or 297
10 or something like that. I'm not sure exactly what it
11 is.
12 Q  Well, I'm going to hold you to 300,000
13 because that's what you said.
14 A  Okay. All right.
15 Q  So you and Antonio don't own -- or GAMCREFK
16 Trust doesn't own any shares in --
17 A  I believe that they own a small percentage,
18 a small amount. I'm not sure what that amount is.
19 Q  How would you determine how that was -- how
20 much --
21 A  I think you'd have to call Hampshire Equity
22 Partners to get the specifics. It's possible that
23 they -- I mean, it is -- there is a possibility that
24 they don't own any any more. I'm not sure. You would

Page 307

1  need to ask Hampshire how much if any.
2       I just want to clarify. I do believe that
3  we did increase sales from -- I do believe that we did
4  increase sales from the year that we -- the 12 months
5  that we bought it to the subsequent 18 months.
6  MR. CAULEY: And by it, you mean IPC?
7  THE WITNESS: IPC. And I think that it was a
8  meaningful increase.
9       (Document marked Plaintiff's
10      Deposition Exhibit No. 43.)
11 BY MR. LATHAM:
12 Q  Let me show you what's been marked as
13 Plaintiff's Exhibit 43.
14     Can you tell me what this document is?
15 A  This is a statement of financial condition.
16 Q  Does this document to your knowledge show
17 the ownership of GAMCREFK, GAMCREFK Trust in IPCAC?
18 A  Tom, I need to ask you a question?
19 MR. CAULEY: Yeah. Why don't we take a --
20 MR. LATHAM: Sure. That's fine.
21     (A brief pause.)
22 BY MR. LATHAM:
23 Q  Does this document disclose the ownership of
24 IPCAC by the GAMCREFK Trust?

Page 308

1  A  I believe it does.
2  Q  Okay.
3  A  But I'm not sure.
4  Q  Okay. Can you make sure?
5  A  I can't make sure.
6  Q  You can't?
7  A  I can't make sure from this document, no.
8  Q  Okay.
9  A  But I believe it's comprehensive of all the
10 assets.
11 Q  Okay. There's -- if you look on page --
12 the fourth page, which is IPC 29247, it shows --
13 A  Which page?
14 Q  Well, it's the fourth page.
15 A  Yes. Okay.
16 Q  It shows GAMCREFK.
17 A  Yeah.
18 Q  It shows three line items.
19     Do any of those relate to IPCAC?
20 MR. CAULEY: I think what the question is is
21 you've testified that GAMCREFK may still own some IPC
22 stock.
23 THE WITNESS: Right.
24 MR. CAULEY: His question is does this document

Page 309

1  reflect that?
2  THE WITNESS: It reflects the value that the
3  trustees have placed on the assets that the trust
4  owns. So I don't know what the trustees -- I don't
5  know if the trustees placed any value on the IPC
6  assets.
7  BY MR. LATHAM:
8  Q  It refers to a section 6.
9     Do you see that?
10 MR. CAULEY: What page are you on?
11 MR. LATHAM: Right next to the GAMCREFK Trust.
12 MR. CAULEY: Oh, okay.
13 BY MR. LATHAM:
14 Q  See right there it says section 6?
15 A  Yes.
16 Q  Where is section 6?
17 A  I don't know. I don't know what -- it might
18 have been -- I don't know.
19 Q  It doesn't look like they're numbered. It
20 looks like they're lettered.
21     Can you tell me where -- I mean, there's a
22 lot of references to a section 6. Can you tell me
23 what --
24 A  Oh, the -- there was -- I think section 6

Page 310

1  refers to a printout of the actual statements from the
2  trust. There were attachments.
3  Q  Okay.
4  A  It's like attachment sets.
5  Q  Okay. I'll take a look in the other
6  documents at a break and see if they're there.
7       Was there a settlement agreement between --
8  was there a settlement agreement relating to the claims
9  by Hampshire?
10 A  Yes.
11 Q  Do you know if that's been produced in this
12 litigation?
13 A  I don't know.
14 Q  Do you know where that is?
15 A  I don't. No, I don't know.
16 Q  If you wanted to get your hands on it, how
17 would you do that?
18 A  I think I would contact the law firm that
19 handled the settlement negotiations.
20 Q  And who is that?
21 A  There were -- I don't remember the name of
22 the law firm specifically. It's a -- there were two
23 firms, one in Chicago -- actually, Antonio Gracias' law
24 firm I think you've been in touch with.

Page 311

1  Q  Stetler & Duffy?
2  A  I'm not good with names.
3  Q  I'm blanking on the name of the attorney we
4  subpoenaed. I'll find that out.
5  A  And I'm not sure there was a settlement
6  agreement, per se, as a release document, something
7  that came to us. I don't remember.
8  Q  Well, a document that reflects the terms and
9  conditions of the resolution of the dispute, put it
10 that way.
11 A  Yeah. I mean, I'm not sure what -- yes.
12 Q  Okay. What issues did Hampshire have?
13 A  They had a litany of issues.
14 Q  Give me the highlights and the low lights.
15 A  I'd have to -- I'd have to refer back to the
16 documents that they sent. I don't remember them in
17 detail without -- but there were -- I mean, there were
18 a large number that -- resulting in a number that was
19 in excess of the amounts in the escrow.
20 Q  When did GAMCREFK Trust get its interest in
21 IPCAC?
22 A  They -- I believe they owned it from the
23 acquisition day.
24 Q  Do you know who Michael Brunner is?

### Page 312

1  A   I don't. The name sounds familiar, but I
2  don't know exactly who he is.
3         (Document marked Plaintiff's
4         Deposition Exhibit No. 44.)
5  BY MR. LATHAM:
6  Q   Showing you what's been marked as
7  Plaintiff's Exhibit 44.
8         Does that refresh your recollection as to
9  who Michael Brunner is?
10 A   Yes, yes, this does.
11 Q   And who is he?
12 A   I believe he was the plant manager for the
13 flash -- the small flashlight maker, the -- like these
14 guys.
15 Q   Uh-huh.
16 A   He was the plant manager or general manager
17 for a flashlight manufacturer out in California.
18 Q   Okay. Were you hiring --
19 A   We were talking to him about hiring him,
20 yes.
21 Q   Did you hire him?
22 A   We did not.
23 Q   Do you continue to hold any position at
24 IPCAC or IPC?

### Page 313

1  A   No, I do not.
2         (Document marked Plaintiff's
3         Deposition Exhibit No. 45.)
4  BY MR. LATHAM:
5  Q   Let me show you what's been marked as
6  Plaintiff's Exhibit 45.
7         Is this the securities purchase agreement
8  with Hampshire?
9  A   Yes, it appears to be.
10 Q   For the record, because this is clipped and
11 it came unstapled, we'll identify it as IPC 011605 to
12 IPC 011720, in case there's any issues like we had
13 yesterday about the completeness of the document.
14        Could you tell me the purchase price
15 reflected in this document?
16 A   They purchased for 21,100,000 redeemable
17 preferred stock.
18 MR. CAULEY: And just so the record is clear, I
19 think given the escrow amounts that that purchase price
20 was subject to adjustment.
21 THE WITNESS: Yes.
22 MR. CAULEY: I mean, that wasn't the price that
23 was actually ultimately paid for the company, as I
24 understand.

### Page 314

1  THE WITNESS: Well, they also had debt.
2  MR. CAULEY: Right.
3  THE WITNESS: That they put in place. This is
4  what they paid for their redeemable preferred stock.
5  They bought $21 million of redeemable preferred stock.
6  BY MR. LATHAM:
7  Q   So they didn't buy common stock?
8  A   They did not buy common stock, no.
9  Q   After the closing, who held the common
10 stock?
11 A   The original shareholders hold the common
12 stock.
13 Q   Okay. So this was voting preferred stock?
14 A   I would need to review all the documents
15 relating to -- I would need to spend, I mean, a
16 significant amount of time just reviewing the documents
17 to understand exactly what it is that they were
18 buying. They have an additional document about -- I
19 mean, there are additional documents to the closing.
20 There's at least 2 feet of -- I think there's probably
21 2 feet of documents.
22        (Document marked Plaintiff's
23        Deposition Exhibit No. 46.)
24

### Page 315

1  BY MR. LATHAM:
2  Q   I'm going to show you what's been marked as
3  Exhibit 46.
4         Does that explain the financial structure of
5  Hampshire's purchase of a portion of IPCAC?
6  A   It helps explain.
7  Q   Okay. On the right-hand side -- on the
8  left-hand side there's it looks like sources of
9  funds -- excuse me -- on the left-hand side.
10 MR. CAULEY: Left-hand side.
11 MR. LATHAM: I have a left-hand, right-hand
12 impairment.
13 THE WITNESS: Yes. It appears to be sources of
14 funds.
15 BY MR. LATHAM:
16 Q   Okay. So the total proceeds to IPCAC was
17 $28,127,843.98?
18 A   I'm sorry. Can you repeat what you said?
19 Q   This number right here, that was the amount
20 paid to IPCAC?
21 MR. CAULEY: Make sure you recall that as one
22 thing. If you're just reading the document, that's
23 something else.
24 THE WITNESS: I'm reading the document. I don't

### Page 316

1  remember. I'm reading this document.
2  BY MR. LATHAM:
3  Q   On the right-hand side is the two funds.
4         Do you see that there?
5  A   Yes.
6  Q   Is that the money that was actually -- I'll
7  ask you a specific question.
8         If you go down to -- see it says Kodsi
9  Family Trust?
10 A   Uh-huh.
11 Q   That's the GAMCREFK Trust?
12 A   Yes.
13 Q   By the way, what does GAMCREFK mean?
14 A   They're the initials of my mother and my
15 wife.
16 Q   Okay. Did the Kodsi Family Trust receive
17 $9,600,009.60?
18 A   I believe so, yes.
19 Q   That was net of the escrow?
20 A   No. I don't -- I'm not sure.
21 Q   Well, it shows below that the escrow agent
22 for IPC holding a million five?
23 A   Yes. Then it would have been. It would
24 have been net of the escrow.

### Page 317

1  Q   And if you look on what's marked as IPC
2  12384.
3  A   Yes.
4  Q   On the left-hand side towards the bottom, it
5  says Kodsi Family Trust. Shows a deposit to a Citibank
6  account.
7  A   Yes.
8  Q   And that was deposited in your account?
9  MR. CAULEY: Object to the reference to the word
10 your.
11 BY MR. LATHAM:
12 Q   Well, in the trust account?
13 A   It went to the trust account, yes.
14 Q   Okay. Did you eventually have to pay any of
15 that back?
16 A   I don't understand the question. Well, I
17 didn't have to pay anything.
18 Q   Well, was any of that money returned to
19 Hampshire?
20 A   Not to my knowledge.
21 Q   Do you know why Hampshire Equity Partners
22 was purchasing redeemable preferred stock?
23 MR. CAULEY: Objection, calls for speculation.
24 THE WITNESS: You have to ask them.

### Page 318

BY MR. LATHAM:
Q   Did you receive any further funds -- did GAMCREFK Trust receive any further funds from Hampshire?
A   I believe it did.
Q   Okay. How much?
A   I'm not sure of the amount.
Q   Okay. What for?
A   MG Capital was -- received some management fees for -- as long as the non-Hampshire shareholders owned more than 10 percent of the company, I believe MG Capital would receive I think 100,000 a year. But I'm not sure if that's correct. It might be more. It might be less.
Q   There was a management agreement between MG Capital LLC and Hampshire or IPCAC?
A   It was in the -- it was in the purchase documents.
Q   Can you show me if it's in the securities purchase agreement?
A   It would take me a while.
MR. CAULEY: Why don't I flip through it while you answer your questions.

### Page 319

BY MR. LATHAM:
Q   It wouldn't be in the table of contents?
A   I didn't see it. It might also be in a different document.
Q   I understand that.
MR. LATHAM: Actually, if you can just show him.
MR. CAULEY: Certainly.
BY MR. LATHAM:
Q   If you could look at IPC 11670.
A   Uh-huh.
Q   It shows a valuation methodology.
A   Uh-huh.
Q   The escrowed shares -- it says, the escrowed shares currently represent 15.5 percent of the fully diluted shares of common stock.
    Those were the shares that were put into escrow that you mentioned?
A   I believe so.
Q   In addition to the million five?
A   Yes.
Q   Now, ultimately did Hampshire exercise its right to those shares?
A   Part of the agreement with them, we returned what had been at the time 80 percent of the -- 80

### Page 320

percent of the shares they received.
Q   They ultimately received 80 percent of the shares?
A   80 percent of these shares.
Q   Oh, 80 percent of the 15.
    So that would have been 15.56 -- this represents 15.56 percent of the remaining 41 percent of the company?
A   I don't remember. I don't know. I believe that it actually represents 15.5 percent of 40, so it would represent about 30 or 50. I believe it represents 30 percent of the then existing shares.
Q   Of the total existing shares?
A   Right, of the 49 percent. I think it's 15.5 percent of 100 percent, and therefore 30 -- 31 percent of 49. This says 15.5 percent of the fully diluted shares.
Q   Okay.
A   So they were taking it from our 49 percent, so it would represent 31.1 percent or 31.12 percent of the 49 percent.
Q   They were taking the 15.56 percent from all of the shares of the company?
A   That's how I read this.

### Page 321

Q   Does fully diluted shares include the common -- redeemable common preferred that Hampshire --
A   I believe it does.
Q   Okay. Let's see. I apologize.
    They took 80 percent of that 15.56 percent?
A   Yes.
Q   So it would be 80 percent of roughly 30 percent that they took back from the existing shareholder's shares?
A   Right.
Q   Okay. 88 percent of 30 percent is 24 percent, so they took back 24 percent of 49 percent?
A   I losing your count. I think at this point in time, again, I think that the GAMCREFK Trust owns a de minimis amount of the equity in IPC, so I'm not exactly -- I'm not sure exactly -- I mean, I didn't follow your math. I'd have to look at it on a piece of paper.
    But, I mean, they took back -- they would have taken back, according to this, you know, approximately, you know, 12 percent of the original -- 12 out of 49 of the original shares that were owned. If there were 49 shares owned -- 49 shares owned, they would have taken back 12 pursuant to this.

### Page 322

MR. CAULEY: Which I think is the same as 24 percent of 49 percent.
THE WITNESS: Right. I didn't -- I'm sorry. I didn't hear it. Yes, that would be correct.
BY MR. LATHAM:
Q   One of these days I'm going to read this deposition. I'll do the math on paper just to make sure.
A   Sure. But again, the GAMCREFK Trust shares independent of the return of shares in the escrow has been significantly diluted.
Q   How?
A   How is it diluted? The Hampshire Equity Partners had to make additional infusions of capital in the business.
Q   So they made a breach of warranty claim or --
A   No, no. They put in additional -- the business didn't -- wasn't doing well. They put additional capital in. They did an acquisition of another business. And then they put additional capital in again because the company again wasn't doing well.
Q   So as a separate transaction, there was a further reduction?

### Page 323

A   Yes.
Q   In the amount that you owned?
A   Again, I didn't own --
Q   Well, GAMCREFK.
A   Yes.
MR. CAULEY: I don't know if it was the amount that was owned, but it was diluted.
THE WITNESS: Yes. There was a significant dilution.
BY MR. LATHAM:
Q   Well, the percentage of the company was further -- was further reduced?
A   Yes, significantly reduced.
Q   I take it there's been no distributions?
A   No.
Q   Why did --
A   And GAMCREFK has not received -- I mean, after -- I believe it was the 10 percent level when all non-Hampshire related investors owned less than 10 percent of the business, then there was no more management fee. I think it was 10 percent. It might have been 20 percent. I'm not sure.
Q   What happened to IPC that it did so poorly?
MR. CAULEY: Objection, calls for speculation.

Page 324

1  BY MR. LATHAM:
2   Q   If you know.
3   A   You'd have to talk to Hampshire.
4   Q   Have they told you any reasons?
5   A   I sat on the board of directors for
6  Hampshire -- not for Hampshire -- for Industrial Powder
7  Coatings for approximately a year after the sale. And
8  at those meetings, there were general discussions about
9  the -- you know, the slow down in the economy, you
10 know, disputes with -- actually, overwhelmingly slow
11 down in sales and in the economy that was having a
12 significant impact to the company.
13  Q   Do you know if Exhibit 45 is -- it says
14 execution copy.
15  A   Yes. It appears to be the execution copy.
16 It has signatures of the --
17  Q   Okay. They were done separately.
18     MR. CAULEY: In counterparts.
19     MR. LATHAM: In counterparts. There you go.
20        (Document marked Plaintiff's
21         Deposition Exhibit No. 47.)
22 BY MR. LATHAM:
23  Q   Showing you what's been marked as Exhibit
24 47.

Page 325

1   A   Yes.
2   Q   For the record, it's -- again, it's a
3  clipped document starting at IPC 11721 to IPC 11800.
4  Again, this says execution copy, and it does have
5  signatures.
6      Can you affirm that it's the execution copy?
7   A   It appears to be so.
8   Q   If you look at 11730, does that section 2.6,
9  does that set forth the management fees?
10  A   Yes, yes, it does. That's a section I was
11 referring. That's what I was referring to with the
12 other document.
13  Q   It says, pay the KG stockholders 37,500 per
14 fiscal quarter.
15  A   Yes.
16  Q   I take it KG means Kodsi family -- it's
17 defined in the first section.
18     MR. CAULEY: Do you have a page?
19     MR. LATHAM: Yeah.
20 BY MR. LATHAM:
21  Q   That's defined collectively as the Kodsi
22 Family Trust and Antonio Gracias; is that correct?
23  A   Yes.
24  Q   So was it paid to MG Capital LLC or to you

Page 326

1  individually, the management fees described in section
2  2.6?
3   A   I'm not sure. I'm not sure. I'm not sure.
4   Q   And that's -- it says here, paid the KG
5  stockholders or at the KG stockholders' request and the
6  affiliate thereof, okay.
7   A   I'm not sure.
8   Q   So you don't know if you designated MG
9  Capital LLC as a recipient or not?
10  A   I'm not sure. I'm not sure. It would have
11 had -- I'm not sure.
12  Q   Closed permitted transferees referred to the
13 original minority shareholders?
14     MR. CAULEY: I'm sorry. What was the phrase?
15     MR. LATHAM: You know what, it has a capital
16 letter, closed permitted transferees.
17     THE WITNESS: It looks like a definitional term.
18 I don't know where -- it would be defined somewhere. I
19 don't know.
20 BY MR. LATHAM:
21  Q   Do you know if that refers to --
22  A   Well, it's a capitalized term. It's a
23 defined term somewhere.
24  Q   If you look on page 11750, it has the

Page 327

1  definitions.
2   A   I'm sorry?
3   Q   11750. It's usually a section that's more
4  closer to the front of the document.
5   A   Sure. Shall have the meaning specified in
6  section 3.2.
7   Q   Which is on page 11730.
8   A   Okay.
9   Q   What I'm getting at is it says -- it says in
10 section 2.6, as long as the KG stockholders and the
11 closed permitted transferees.
12     Do you know if that was the Kodsi Family
13 Trust and Antonio Gracias and the original minority
14 shareholders?
15     MR. CAULEY: I object as far as you're asking him
16 to construe a legal document.
17     THE WITNESS: I mean, I could just read the
18 definition that's under -- it says the transferees
19 referred to section 3.2A through 3.2D.
20     Would you like me to read that?
21  Q   No. That's not necessary.
22     When did that 10 percent trigger occur?
23     MR. CAULEY: You mean when they stopped receiving
24 management fees?

Page 328

1      MR. LATHAM: Yeah.
2  BY MR. LATHAM:
3   Q   When did the ownership fall below 10 percent
4  for purposes of section 2.6?
5   A   I'm not sure.
6   Q   Was it at the time the dispute was
7  resolved?
8   A   No. It was prior to that.
9   Q   How did that occur? I mean, is there some
10 term in one of the documents that allows them to take
11 more than the 15.56 percent?
12  A   They put additional money into the business.
13  Q   Okay. And so there was an additional
14 agreement?
15  A   No. It's governed in these agreements. I
16 don't believe that there were any additional
17 agreements.
18  Q   Are there any documents reflecting the
19 cessation of the management fee?
20  A   I think it's just this.
21  Q   Was there a notice or --
22  A   No. It would have been pursuant to this.
23        (Document marked Plaintiff's
24         Deposition Exhibit No. 48.)

Page 329

1  BY MR. LATHAM:
2   Q   Let me show you Exhibit 48.
3   A   Yes.
4   Q   Can you tell me what this is to your
5  knowledge?
6   A   The escrow agreement among Hampshire Equity
7  Partners and the sellers listed individually as on
8  schedule A as the sellers; Antonio J. Gracias and Alain
9  Kodsi as the seller's agent; and Industrial Powder
10 Coating Acquisition Corp. as the company; and First
11 Star Bank National Association as the escrow agent.
12  Q   To your knowledge, is this the document by
13 which the million five and the 15.56 percent shares
14 were held in escrow?
15  A   Yes.
16  Q   To your knowledge, was anything else held in
17 escrow by this agreement?
18  A   Not to my knowledge, no.
19  Q   Actually, let's go back to Exhibit 45. Turn
20 to 11670 again. It talks about a valuation. Is
21 that -- it talks about the value of the escrowed
22 shares, which is roughly the 30 percent of the 40
23 percent, 49 percent that we talked about.
24  A   That's how I interpret it.

### Page 330

```
 1   Q   It talks about a valuation of those shares.
 2   A   Uh-huh.
 3   Q   Is the formula set forth below to your
 4   knowledge the agreed upon valuation of the escrowed
 5   shares?
 6       MR. CAULEY: Objection to form.
 7       I don't know what you mean by agreed upon
 8   value.
 9       MR. LATHAM: It says the value of the escrowed
10   share at the time an indemnity claim is made pursuant
11   to section 10.4 of this agreement shall be determined
12   as follows.
13       MR. CAULEY: Right. And there's a form there.
14       My objection is if you're asking whether
15   that represents the fair market value, I object. That
16   calls for speculation.
17   BY MR. LATHAM:
18   Q   No. I'm asking you if that was the agreed
19   upon formula for valuing the escrowed shares?
20   A   It is the valuation method used to
21   determine the value of an escrowed share at the time an
22   indemnity claim is made.
23   Q   Do you know why there was a valuation
24   formula put into the agreement?
```

### Page 331

```
 1       MR. CAULEY: Objection, calls for speculation,
 2   calls for a legal conclusion.
 3       THE WITNESS: I don't specifically remember.
 4       (Document marked Plaintiff's
 5       Deposition Exhibit No. 49.)
 6   BY MR. LATHAM:
 7   Q   Showing you what's been marked as
 8   Exhibit 49.
 9       Is this the letter of intent to purchase --
10   from Hampshire Equity Partners for the purchase of
11   portion of IPC?
12   A   It appears to be, yes.
13   Q   Actually, it was IPCAC they were purchasing;
14   is that correct?
15       MR. CAULEY: Do you have a specific provision
16   you're referring to?
17       THE WITNESS: Yeah. I don't -- without looking
18   at more documents, I'm not sure what it is that they
19   were --
20   BY MR. LATHAM:
21   Q   Well, who did Hampshire purchase their
22   shares from? Was it shares of IPCAC, or was it shares
23   of IPC?
24   A   Again, I believe it was industrial -- IPCAC,
```

### Page 332

```
 1   but I'm not sure. I'm not sure, so I should say I'm
 2   not sure.
 3   Q   You've alleged in the complaint that Brian
 4   began competing with -- the complaint alleges MG
 5   Capital LLC prior to the time he left.
 6   A   Uh-huh.
 7   Q   What do you base that on?
 8   A   Can you ask the question one more time?
 9   Q   Well, you've alleged in your complaint that
10   prior to the time that -- let's ask this.
11       When did Brian's affiliation with MG Capital
12   LLC end?
13   A   I'm not sure of the specific date, but I
14   think it was -- it was right around August, the
15   beginning of August, August 3 or something, from the
16   letter that you showed me yesterday.
17       But I subsequently discovered that he'd
18   established the Sullivan Companies at some point prior
19   to his leaving. I subsequently learned that he
20   contacted individuals that were -- that we worked with
21   as well. And subsequently learned that he'd taken
22   files.
23       I didn't know at the time that he took files
24   relating to transactions that he was working on.
```

### Page 333

```
 1   Subsequently learned that he was making an offer for a
 2   company that he was working on while he was working for
 3   MG Capital. I mean, those are some of the reasons.
 4   Q   Any others?
 5   A   Like he took -- he took a lot of files. He
 6   took transactions he was working on when he was at MG
 7   Capital. He contacted individuals who we -- who MG
 8   Capital worked with. Those are the main reasons.
 9   Q   Who did he contact?
10   A   Well, I know he contacted Anthony Bienstock,
11   Steven Elkind.
12   Q   When did he contact Anthony Bienstock?
13   A   I'm not sure of the date.
14   Q   Before he left?
15   A   I'm not sure of the dates.
16   Q   When did he copy Steven Elkind?
17   A   I'm not sure of the date.
18       (Document marked Plaintiff's
19       Deposition Exhibit No. 50.)
20   BY MR. LATHAM:
21   Q   I show you what's been marked as Plaintiff's
22   Exhibit 50.
23       Does that refresh your recollection as to
24   when Brian contacted Steven Elkind?
```

### Page 334

```
 1   A   It does not.
 2   Q   Okay. Do you know if it was before that
 3   day?
 4   A   I do not know a date.
 5   Q   Who is Steven Elkind?
 6   A   He is the attorney for the GAMCREFK Trust.
 7   He's an attorney for the GAMCREFK Trust.
 8   Q   Was he attorney at the time?
 9   A   Yes.
10   Q   Is he a deal lead for MG Capital LLC?
11   A   He's a potential deal lead for MG Capital
12   LLC.
13   Q   When did he become a potential deal lead?
14   A   He was always that.
15   Q   When?
16   A   Probably January of '97.
17   Q   Why that date, do you remember?
18   A   No. I just -- that's -- I know that we were
19   working with him back then, probably early '96, middle
20   of '96, all the way back to the middle of '96 probably
21   actually.
22   Q   Do you know how Brian learned his identity?
23   A   I think he was introduced to him by myself
24   or Antonio Gracias.
```

### Page 335

```
 1   Q   Okay. In what context?
 2   A   I don't remember the context.
 3   Q   Do you know the purpose?
 4   A   Of what? I'm sorry.
 5   Q   Of introducing Brian to Steven Elkind.
 6   A   I don't remember why, no.
 7   Q   Do you know if Brian worked on any deals
 8   that originated from Steven Elkind?
 9   A   I don't remember.
10   Q   Let me show you what was marked as Exhibit
11   39.
12       Does that refresh your recollection as to
13   when Brian's relationship with you, Antonio, and MG
14   Capital LLC terminated?
15   A   Yes, it does.
16   Q   When was that?
17   A   Well, according to the letter that Brian
18   sent, it says that it terminated on July 20; but the
19   letter is dated August 3. And I remember that he was
20   still in our offices at the end of July. I believe
21   that he was still in our offices at the end of July. I
22   don't remember the date of the meeting that I had with
23   Brian.
24   Q   Do you know whether or not he removed -- he
```

### Page 336

1  was told to leave MG Capital on the 20th by Antonio
2  Gracias?
3      MR. CAULEY: 20th of?
4      MR. LATHAM: July.
5      THE WITNESS: I don't remember the specific day,
6  no.
7          And the other part of this that I find very
8  difficult to understand, in this letter he says he
9  terminates his business relationships with the two --
10 with Antonio Gracias and myself and with MG Capital
11 LLC, but he would like to continue to receive money
12 from our company Amax Plating. I am not terminating my
13 employment with Amax Plating, which is -- I mean, the
14 letter in itself is ridiculous.
15 BY MR. LATHAM:
16     Q   Why?
17     A   Because he only was on Amax Plating's
18 payroll because he was working for us, MG Capital.
19     Q   He was performing services for Amax?
20     A   He performed some services for Amax, but he
21 didn't go to Amax. He didn't have a 9:00 to 5:00 job
22 at Amax. The CEO of Amax Plating was Antonio Gracias.
23 The chairman of the board for Amax Plating was myself.
24 And he had stated that he could not take any direction

### Page 337

1  from Antonio Gracias of any kind.
2      Q   Why?
3      A   You'd have to ask him.
4      Q   What damages resulted to your knowledge
5  from Brian's alleged competing with MG Capital before
6  he left?
7      MR. CAULEY: Objection to form.
8      THE WITNESS: I'm sorry.
9  BY MR. LATHAM:
10     Q   I'm sorry.
11         What damages, what money damages resulted
12 from Brian allegedly competing with MG Capital before
13 he left?
14     MR. CAULEY: Objection to form.
15     THE WITNESS: I think any transactions that he
16 was working on that might have come to conclusion that
17 we did not have the opportunity to close resulted in
18 damages. I think the moneys that we paid him through
19 Amax Plating resulted in damages. His reimbursement of
20 expenses resulted in damages. His taking of documents,
21 you know, and I'm not sure what he took from our
22 offices, resulted in damages. I have not had the
23 opportunity to look through everything that he's taken
24 or that he did. I still don't even know what he fully

### Page 338

1  did.
2  BY MR. LATHAM:
3      Q   The deals you weren't able to complete, why
4  weren't you able to complete them?
5      MR. CAULEY: Objection to form.
6      THE WITNESS: I'm sorry.
7  BY MR. LATHAM:
8      Q   You mentioned deals that you weren't able to
9  complete that Brian was working on.
10         Why weren't you able to complete them?
11     A   Well, we had paid for Brian to travel. We
12 had paid for Brian to analyze businesses. And he was
13 the primary person that was working on the transactions
14 that he had sourced. And we trusted that he would show
15 us the work product, the result of that.
16     Q   You claiming that the work product wasn't --
17 that MG Capital didn't have the work product after
18 Brian left?
19     MR. CAULEY: Objection, assumes facts not in
20 evidence. Go ahead. And misstates testimony.
21         Go ahead and answer.
22     THE WITNESS: I don't know what he took or what
23 he didn't take.
24

### Page 339

1  BY MR. LATHAM:
2      Q   Okay. If Brian was an at will employee at
3  MG Capital LLC -- was he an at will employee?
4      MR. CAULEY: Objection, calls for legal
5  conclusion.
6      THE WITNESS: Can you repeat the question?
7  BY MR. LATHAM:
8      Q   Well, could Brian -- could you fire Brian at
9  any time you wanted to?
10     A   Yes, I think so.
11     Q   Could he leave at any time he wanted to?
12     A   Yes, I think so.
13     Q   Did he owe any obligation to complete any of
14 the transactions he was working on?
15     A   No, I don't believe that he -- I don't
16 believe that he needed to complete the transactions he
17 was working on.
18     Q   Okay. Did MG Capital attempt to complete
19 any of the transactions he was working on?
20     A   I'm not sure if -- I'm not sure.
21     Q   Was MG Capital prevented from purchasing any
22 companies by the actions -- by Brian's alleged actions?
23     A   I think it was.
24     Q   Okay. How?

### Page 340

1      A   He worked on -- he worked on obtaining
2  financial information, negotiating for the company on
3  behalf of MG Capital. And then, you know, to my
4  knowledge, that information -- I didn't see that
5  information once he left. He did not brief us on where
6  we were in the process with the companies that he was
7  talking to. He did not provide us with a list of the
8  companies he was working on at the time. He didn't
9  provide -- he didn't provide any of that information to
10 my knowledge.
11     Q   Did you ask him to?
12     A   I don't know if we asked him to. We asked
13 him to return all information that he had taken from MG
14 Capital, which I do not believe he did.
15     MR. CAULEY: Take a two-minute break?
16     MR. LATHAM: Sure.
17         (A brief recess was taken from the
18          hour of 10:08 a.m. to the hour of
19          10:16 a.m.)
20 BY MR. LATHAM:
21     Q   Prior to the time that Brian left, had he
22 contacted any investors?
23     A   I don't know. But every time I talk to the
24 lawyers, I'm learning something new about what he took

### Page 341

1  or what he did.
2      Q   Well, do you know of any investors he
3  contacted prior to the time he left?
4      A   No.
5      Q   Has MG Capital or you or Antonio been
6  prevented from acquiring any companies?
7      A   Actually, I change that. I think Anthony
8  Bienstock actually, but I'm not sure if it was before
9  he left or after he left.
10     Q   But do you know why he contacted Anthony?
11     A   I don't.
12     Q   Based on your allegations in the complaint,
13 have you or Antonio or MG Capital been prevented from
14 acquiring any businesses?
15     A   I think we were, yes.
16     Q   Which ones?
17     A   I think High Performance.
18     Q   Any others?
19     A   I'm not sure.
20     Q   How did Brian's actions prevent you from
21 completing the acquisition of High Performance?
22     A   He spent significantly all his time working
23 on the High Performance transaction to my knowledge
24 for the several months before he left or actually that

Page 342

1  we asked him to leave. And he did all the work that's
2  associated with an acquisition, which is a ton of work.
3  And he walked out with all that information and all the
4  work that he had done. And then I learned from the
5  lawyers that he tried to buy the company separately.
6  Q    Did Brian have a noncompete?
7  A    He did not to my knowledge.
8  Q    So when he left, he was free to compete with
9  MG Capital?
10 A    I believe he was free to compete with MG
11 Capital, yes, but not on deals that we -- but not on
12 the deal like High Performance transaction in which
13 he -- we paid for his trips to Florida. We paid for
14 all the work he did on that transaction. He sat in our
15 office. He took our money. He took our resources. He
16 took our reputation.
17      He gathered all this information, and then
18 he walks out the door evidently with all the files
19 associated with the transaction and all the work he did
20 on it and then he tries to buy the company
21 independently.
22 Q    Assume for the moment that he didn't take
23 any files.
24 A    Yes.

Page 343

1  Q    Would he have been prevented from attempting
2  to purchase companies that he had worked on at MG
3  Capital?
4  MR. CAULEY: Objection. First, assumes facts not
5  in evidence. Second, I object to the extent you're
6  asking for a legal conclusion.
7  THE WITNESS: Can you ask the question again?
8  BY MR. LATHAM:
9  Q    Well, if he knew about -- if he knew about
10 ABC -- if he knew that ABC Company was up for sale
11 while working at MG Capital and had quit or been fired.
12 A    Right.
13 Q    And went home with, you know, the shirt on
14 his back and then contacted ABC Company to purchase
15 them, what in your mind would have prevented him from
16 doing that?
17 MR. CAULEY: Objection; hypothetical.
18 THE WITNESS: Yeah, that's not what happened. I
19 don't want to talk about that. That's not what he
20 did. He stole documents. He left. He misrepresented
21 what he was doing.
22 BY MR. LATHAM:
23 Q    I understand you don't want to talk about
24 it, but I'm asking you to answer the question to the

Page 344

1  best of your ability.
2  A    I can't answer that question.
3  Q    Why?
4  A    Because that's not what happened.
5  Q    Did you try to purchase High Performance
6  Systems after Brian left?
7  A    I don't believe so.
8  Q    Why not?
9  A    Because we hadn't done the work. There's a
10 lot of work that goes into finding out whether a
11 company that one should invest in, and Brian had done
12 that.
13 Q    Right. And --
14 A    And he had done that while he was taking
15 money from us.
16 Q    And that's true even if Brian had left with
17 the shirt on his back and nothing else?
18 A    I'm sorry?
19 Q    And that would be true if Brian left with
20 nothing but the shirt on his back?
21 A    What would be true?
22 Q    That he had done all the work?
23 A    Yes.
24 Q    Okay. So, other than the fact that Brian

Page 345

1  left, what prevented you from attempting to purchase
2  High Performance Systems?
3  A    We didn't have the information associated
4  with the due diligence that Brian had done or any of
5  the contacts or any of the -- I mean, he spent a lot of
6  time. All the time that we were working on IPC, he was
7  working on High Performance.
8  Q    The deal file for High Performance wasn't
9  in MG Capital's office?
10 A    I don't know. It evidently went out the
11 door with Brian.
12 Q    Did you look for it?
13 A    I don't remember at this point. It was not
14 a deal that I actively worked on.
15 Q    Do you know if based on the allegation in
16 your complaint you were prevented from evaluating any
17 company?
18 A    To the extent that Brian took information
19 that we otherwise might have had at our disposal, yes.
20 And I don't know what he took or what he didn't take.
21 Again, every time I talk to the lawyers, they're
22 showing me something else that he took or did. I still
23 don't know everything you have marked attorney's eyes
24 only, confidential.

Page 346

1  Q    Assuming the files were not taken by Brian,
2  could you have evaluated the acquisitions that he was
3  working on?
4  MR. CAULEY: Objection, assumes facts not in
5  evidence.
6  THE WITNESS: We could have begun the process of
7  evaluating, but there's a lot. There's phone
8  conversations. There's a lot that goes into
9  understanding a business beyond just the paper that one
10 looks at.
11 BY MR. LATHAM:
12 Q    And that would be true regardless of whether
13 or not Brian had taken any documents?
14 A    That's true.
15 Q    What companies was MG Capital prevented from
16 operating based on Brian's alleged conduct in the
17 complaint?
18 A    Any company that we might have come to --
19 that we might have ended up acquiring as a result of
20 the work Brian was doing on businesses.
21 Q    Was there any assurances that you would have
22 completed any of those deals had Brian not left?
23 A    No, absolutely not.
24 Q    Did MG Capital have any written policies,

Page 347

1  general written policies concerning the creation,
2  ownership, safeguarding, or disclosure of trade
3  secrets?
4  A    I'm not sure. I would -- I'd have to ask
5  the lawyers. They worked on all that stuff.
6  Q    What lawyers?
7  A    It probably would be Sidley & Austin. The
8  other part also, when you talk about opportunities lost
9  regarding High Performance, I remember Antonio or
10 myself talking to our existing lenders about Brian's
11 deal working on High Performance.
12      And it's very disruptive in a business that
13 relies on relationships to get transactions done to try
14 to explain to a lender a transition. It's very
15 difficult and it's very awkward. But I do remember
16 Brian speaking with existing lenders that MG Capital
17 had relationships with.
18 Q    Who?
19 A    I think Finova in particular.
20 Q    Was Finova a proprietary financing source?
21 A    No.
22 Q    So after --
23 A    But I think that there were a couple of
24 people that he spoke to. I don't remember who, but I

Page 348

1  remember that -- I think Antonio in particular tried to
2  introduce...
3     Q   Who were MG Capital LLC's proprietary
4  lenders?
5     A   We had no proprietary lenders, senior
6  lenders. We had proprietary subinvestors.
7     Q   Who were those?
8     A   Primarily the ones listed on -- as
9  shareholders of IPC.
10    Q   Primarily. Anybody else?
11    A   I mean, other people with whom we had
12 relationships with.
13    Q   Do you know if Brian ever contacted any of
14 your subdebt lenders?
15    A   You'd have to ask Brian.
16    Q   But you don't know of any?
17    A   I'm not sure.
18    Q   Who were MG Capital's proprietary deal
19 sources?
20    A   I am taking the word proprietary to mean
21 exclusive sources. We did not have exclusive sources.
22    Q   What do you mean by exclusive?
23    A   That the individuals that would provide us
24 with information only provided it to us.

Page 349

1     Q   After Brian left, all things being equal
2  with Brian, if Brian wanted to do a deal on his own?
3     A   Yes.
4     Q   Straight from the start?
5     A   Yes.
6     Q   Who among your senior lenders was Brian
7  prevented from contacting?
8     A   Nobody.
9     Q   Who among your subdebt lenders was Brian
10 prevented from contacting?
11    A   Nobody.
12    Q   Who among your deal sources was Brian
13 prevented from contacting?
14    A   Nobody, but he didn't know them.
15    Q   So Brian could have -- anybody he knew
16 about, could he have contacted them to find the deal?
17    MR. CAULEY: Objection, calls for legal
18 conclusion.
19    THE WITNESS: I'm sorry. Repeat it.
20 BY MR. LATHAM:
21    Q   Could Geneva National -- not Geneva
22 National. I'm thinking of the golf course, which is
23 where I wish I were right here.
24    A   Sure.

Page 350

1     Q   Other than with my kids.
2     A   Sure.
3     Q   Geneva is a deal source?
4     A   Yes.
5     Q   After Brian left, could he have contacted
6  Geneva to find deals?
7     A   Yes.
8     Q   If Brian wanted to offer a piece of an
9  investment to Tony Bienstock, could he have done that?
10    A   Yes.
11    Q   Of the people Brian knew about during the
12 time he was associated with MG Capital LLC or MG
13 Capital Corp. or you and Antonio, who was Brian to your
14 knowledge prevented from contacting in the course of
15 trying to put together a deal he had found after he
16 left?
17    MR. CAULEY: Two objections. First, assumes that
18 Mr. Kodsi knows who Mr. Sullivan knew. Calls for
19 speculation. I also object to the extent it calls for
20 a legal conclusion.
21    THE WITNESS: You have to repeat the question.
22    MR. LATHAM: Okay. Could you repeat the question,
23 ma'am.
24    (The record was read.)

Page 351

1     THE WITNESS: I believe that the question you
2  were asking was who would Brian be prevented from
3  contacting on a completely different transaction?
4  BY MR. LATHAM:
5     Q   Yes.
6     A   Once he left?
7     Q   Yes.
8     A   I don't think that he was prevented from
9  contacting anyone.
10    Q   Okay.
11    A   Actually, I'd like to clarify that. I think
12 that he would have been prevented from contacting our
13 subdebt investors, our list of investors, not -- when I
14 answered that question, I was referring to
15 institutional organizations, not individuals or small
16 entities that he had -- he would have absolutely no
17 ability to know of but for having worked with Antonio
18 and myself or worked at MG Capital.
19    Q   Those would be the list of the investors in
20 IPC?
21    A   Those would be the list of investors in IPC,
22 that's right.
23    Q   Any others?
24    A   No. It would be primarily the list of

Page 352

1  investors.
2     Q   Tony Bienstock is on that list?
3     A   Yes.
4     Q   Would he have been prevented from contacting
5  Tony Bienstock to invest in a deal?
6     A   I think so, but I don't know. I don't know
7  legally, but I think so, yes.
8     Q   Why?
9     A   Because that was a -- that was a source
10 of -- a funding source or -- well, first, he was an
11 employee at MG Capital. And so I don't think that he
12 would have been permitted to deal with employees of MG
13 Capital.
14    Q   Were there any written agreements between
15 Brian and MG Capital?
16    A   I'm not sure.
17    Q   Okay. Were there any agreements between
18 Brian and MG Capital relating to trade secrets,
19 confidential information, proprietary information,
20 documents, or other information created, owned, or used
21 by MG Capital or Sullivan?
22    A   You'd have to ask the lawyers.
23    Q   You don't know of any?
24    A   Well, I know clearly that he shouldn't take

Page 353

1  stuff that wasn't his. That's for sure.
2     Q   But I'm talking about written agreements.
3     A   You'd have to ask the lawyers.
4     Q   Did MG Capital -- did MG Capital purchase
5  IPC?
6     A   Not to my knowledge.
7     Q   Did Brian ever call anybody to encourage
8  them to sue you, Alain -- you, Antonio or MG Capital?
9     A   I think that he took proprietary documents
10 that were MG Capital's to an individual that we were in
11 a valuation dispute with. You know, that was shocking.
12    Q   Okay.
13    A   And I think that was an attempt to encourage
14 lawsuits.
15    Q   That lawsuit was already pending?
16    A   It was a valuation. There was no
17 existing --
18    Q   Who was that existing shareholder?
19    A   He was not an existing shareholder.
20    Q   Who was that dispute with?
21    A   Jeff Briggs.
22    Q   Had a lawsuit been filed either by or
23 against Jeff Briggs?
24    A   Yes.

### Page 354

1  Q   At the time Brian left?
2  A   Yes.
3  Q   Did Brian ever contact to your knowledge Tom
4  Horak to encourage Tom Horak to sue either you,
5  Antonio, or MG Capital?
6      MR. CAULEY: Let me admonish. To the extent
7  you've learned things through your lawyers, instruct
8  you not to answer.
9      THE WITNESS: I can't answer.
10 BY MR. LATHAM:
11 Q   Did Tom Horak ever sue you, Antonio, or MG
12 Capital?
13 A   No.
14 Q   Has there ever been a dispute between you,
15 Antonio, MG Capital Corp. or LLC and Tom Horak after
16 Brian left?
17 A   Not that I'm aware of.
18 Q   Did Tom Horak ever claim that he was
19 entitled to invest in Overland-Bolling?
20 A   Not that I'm aware of.
21 Q   Jeff Briggs was not an employee of MG
22 Capital LLC? Jeff Briggs was not an employee of MG
23 Capital LLC; is that correct?
24 A   Oh, no, he was not.

### Page 355

1  Q   What happened to the deal files that Brian
2  was working on prior to the time that MG Capital LLC
3  was formed?
4  A   What was happening to the deal files before
5  MG Capital LLC was formed, I don't know.
6  Q   Before the time that Brian was -- before the
7  time that MG Capital LLC was formed, who was Brian
8  working for?
9  A   MG Capital Corp. through Amax I believe
10 would be the answer.
11 Q   Was he working on any potential deals for MG
12 Capital Corp.?
13 A   I don't remember the time. That was '97.
14 Q   Did MG Capital LLC purchase any deal files
15 from MG Capital Corp.?
16 A   No.
17 Q   Did MG Capital LLC purchase any assets in MG
18 Capital Corp.?
19 A   I don't remember.
20 Q   Did MG Capital Corp. ever assign any assets
21 to MG Capital LLC?
22 A   I don't recall.
23 Q   Have you ever assigned any of your assets to
24 MG Capital LLC?

### Page 356

1  A   Nothing springs to mind.
2  Q   Do you know if Antonio did?
3  A   Nothing springs to mind.
4  Q   Do you know if Jeff Briggs did?
5  A   Nothing is springing to mind.
6  Q   Where did MG Capital LLC get its deal leads?
7  A   From a variety of sources, lawyers,
8  individuals, professionals that we knew, networks of
9  contacts that we built.
10 Q   Did any of those deal leads exist prior to
11 the time MG Capital LLC was formed?
12 A   Yes.
13 Q   Now, the potential investors or the subdebt
14 investors as we called them, we'll also refer to them
15 as the IPC investors, were they potential investors
16 prior to the time MG Capital LLC was formed?
17 A   Potential investors in what?
18 Q   In a deal that you, Antonio, or MG Capital
19 might be putting together? I mean, were they potential
20 investors in May of 1997?
21 A   Yes.
22 Q   Were they potential investors in the deal
23 that MG Capital Corp. might put together?
24 A   Yes.

### Page 357

1  Q   Were you a manager of MG Capital from the
2  time it was incorporated until August 3? Were you a
3  manager?
4  A   Of?
5  Q   MG Capital from --
6  A   Which?
7  Q   LLC.
8  A   I was a -- I think I was initially a member
9  and then a manager, yes.
10 Q   Were you a member and a manager at the same
11 time?
12 A   I'm not sure if I had both titles.
13 Q   Do you know if MG Capital LLC had worker's
14 compensation insurance for Brian?
15 A   No.
16 Q   No, it didn't?
17 A   No, I do not believe it did.
18 Q   Did you ever report Brian as an employee of
19 MG Capital LLC to the State of Illinois?
20 A   I'm not -- I'm not sure.
21 Q   Prior to August 3, 1998, had MG Capital
22 acquired -- MG Capital LLC acquired any companies?
23 A   Which date?
24 Q   Prior to August 3, 1998.

### Page 358

1  A   I mean, we acquired IPC, Industrial Powder
2  Coatings. We had made investments in Answerthink
3  Consulting Group. I'm not sure of the dates of other
4  acquisitions that we made.
5  Q   But those weren't investments made directly
6  by MG Capital LLC, were they?
7  A   No. They were made by the two principal
8  shareholders of MG Capital LLC. You continue to draw
9  these distinctions about it.
10 Q   There's no distinction between you and
11 Antonio and MG Capital LLC?
12 A   A distinction between me -- well, first off,
13 the shareholders are GAMCREFK Trust and Antonio Gracias
14 and there are distinctions. There are legal
15 distinctions, yes.
16 Q   So I'm drawing legal distinctions.
17 A   Okay.
18 Q   So, using the legal distinction, MG Capital
19 never acquired any companies prior to August 3, 1998,
20 did they?
21     MR. CAULEY: Objection insofar as calls for legal
22 conclusion.
23     THE WITNESS: I think that's right. No. It had
24 made real estate investments through a partnership and

### Page 359

1  Answerthink Consulting Group, I believe.
2  BY MR. LATHAM:
3  Q   Prior to the time the -- we looked yesterday
4  at the assignment of the management agreement from
5  Connector Service Corp. to MG Capital LLC.
6      Prior to that time, had MG Capital LLC
7  managed under a management agreement Amax?
8  A   It was managing Amax, yes. I mean, it did
9  manage.
10 Q   Prior to that time?
11 A   Yes, it was managing Amax, yes.
12 Q   You allege in your complaint that the
13 Sullivan Companies has not complied with corporate
14 formalities.
15     Do you know what is that based on?
16 A   You have to speak to the lawyers.
17 Q   Do you know anything personally?
18 A   Nothing that I didn't learn from the
19 lawyers.
20 Q   You alleged in the complaint that MG -- that
21 Sullivan Companies did not maintain a separate checking
22 account from Brian Sullivan.
23     Do you know if that's true or not?
24     MR. CAULEY: If you only learned it from lawyers,

**Page 360**

1 then I instruct you not to answer.
2 THE WITNESS: I only learned it from lawyers.
3 BY MR. LATHAM:
4   Q   So other than what your lawyers tell you,
5 you don't know whether or not Brian and the Sullivan
6 Companies maintain separate checking accounts?
7   A   No. I've learned everything from the
8 lawyers to the extent that I know.
9   Q   We asked you to admit that Sullivan and the
10 Sullivan Companies maintained separate bank accounts,
11 and you denied that.
12      What is that denial based on?
13  A   My own personal knowledge.
14  Q   Okay. What in your own personal knowledge
15 caused you to deny that admission?
16  A   Read the question again one more time,
17 please.
18  Q   Admit that the Sullivan -- that Sullivan and
19 the Sullivan Companies maintain separate bank accounts?
20  A   I denied it because I don't know.
21  Q   What were MG Capital LLC's trade secrets?
22  MR. CAULEY: I object to the extent it calls for
23 a legal conclusion, but give him your lay person's
24 explanation.

**Page 361**

1 THE WITNESS: Trade secrets would be our
2 financial models, our relationships with investors, how
3 we looked at deals, things along those lines.
4 BY MR. LATHAM:
5   Q   Anything else?
6   A   Generally that.
7   Q   Okay. Financing sources?
8   A   Yeah, to the extent who we used, how we used
9 them, the structures of our -- the capital structures
10 that we were able to put in place, yes, those were --
11  Q   But the individuals themselves?
12  A   To the extent that people who work for us
13 would not have access to them or other people would not
14 have access to them but for us, yes.
15  Q   Do you know if Brian misappropriated any of
16 your financing sources?
17  A   You'd have to ask Brian.
18  Q   But you don't know of any through your --
19  A   Nothing that I haven't learned through my
20 lawyers.
21  Q   How did you keep your financing sources
22 confidential?
23  A   We only discussed it within our business
24 context.

**Page 362**

1   Q   Did you ever tell Brian that we're
2 disclosing this to you only for purposes of this and
3 you're specifically not to contact these people in the
4 future?
5   A   No, I do not remember ever doing that. I
6 don't know if Antonio ever did that, but I don't
7 remember ever doing that.
8   Q   Did Brian ever expressly agree to keep your
9 financing sources confidential, or was that an implied
10 term of his working there?
11  A   Can you ask the question one more time?
12  Q   Did Brian ever expressly agree to keep your
13 financing sources confidential, or was that an implied
14 term of his working with you?
15  A   I think what he learned while he worked for
16 us, it was implied that he would not disclose that.
17  Q   Okay. What about --
18  A   But I think he could contact them for
19 independent deals if he did.
20  Q   Outside once he left?
21  A   Yes.
22  Q   What about your subdebt lenders, your
23 potential investors. We've called them several things.
24 We'll call them the IPC investors which are --

**Page 363**

1   A   Sure.
2   Q   Okay. What about your IPC investors, did he
3 ever agree specifically or expressly to keep those
4 confidential?
5   A   No, I do not remember him ever agreeing to
6 specifically keeping them confidential, but clearly we
7 thought he would.
8   Q   Okay. You've considered it implied?
9   A   Yes.
10  Q   Did Brian ever expressly agree to keep your
11 financial models confidential?
12  A   No, he did not expressly agree to that to my
13 knowledge.
14  MR. CAULEY: As far as you know?
15  THE WITNESS: To my knowledge.
16 BY MR. LATHAM:
17  Q   How did you keep your financial models
18 confidential?
19  A   Well, I didn't share them with people,
20 except to the extent that we were working on a specific
21 transaction regarding our capital structure or the
22 valuation of a business.
23  Q   Where was the financial model kept?
24  A   Probably on a computer in MG Capital's

**Page 364**

1 offices in Chicago.
2   Q   Do you know if Brian had financial models on
3 his personal computer?
4   A   I do not know.
5   Q   Who created the financial model?
6   A   I think in large part Antonio Gracias.
7   Q   Anybody else?
8   A   I'm not sure.
9   Q   When did he create it?
10  A   I think he worked -- he developed it over --
11 you know, from 1995 forward.
12  Q   Do you know what changes he made to it after
13 MG Capital LLC was formed?
14  A   I do not specifically know.
15  Q   Do you know if Brian made any changes to the
16 financial model?
17  A   I don't specifically know.
18  Q   Who owns the financial model?
19  A   MG Capital LLC.
20  Q   Does MG Capital Corporation own it?
21  A   I'm not sure.
22  Q   Do you own it?
23  A   No, I don't own it.
24  Q   Does Antonio Gracias own it?

**Page 365**

1   A   To the extent that he owns MG Capital LLC.
2   Q   Only based on his position as an MG Capital
3 owner?
4   A   Yes.
5   Q   Do you know about a company called Valor
6 Equity Partners? I think it's Valor Equity. I don't
7 know if it's partner. But do you know of a company
8 named Valor Equity?
9   A   I have no -- it's Antonio's -- Antonio is
10 now continuing to buy businesses and stuff, so that's
11 what that does.
12  Q   Do you know if he's using the financial
13 model?
14  A   I believe he is using the financial model.
15 He has permission. He asked for the ability to use it.
16  Q   And you gave him that permission?
17  A   Yes. I mean, MG Capital LLC. If I
18 misunderstood your previous question, I apologize, if
19 that's what you were trying to get to.
20  Q   Well, that's why I clarified it.
21  A   I apologize. I didn't understand it.
22  Q   Do you know if he paid to use it?
23  A   No, he did not pay to use it.
24  Q   Do you know what deal leads he's using?

**Page 366**

1  A  He's probably -- no, I'm not sure of all the
2  deal leads he's using. I'm sure that they're a lot of
3  the ones that we used at MG Capital LLC.
4  Q  Did he purchase those from MG Capital LLC?
5  A  No.
6  Q  The permission to use the model, is that in
7  writing?
8  A  No. I'm not sure. It might be somewhere,
9  but I don't think it is.
10 Q  The IPC investors, the potential investors,
11 do you know if those are potential investors of Valor?
12 A  Yes, they are potential investors of Valor?
13 Q  Did he purchase those from MG Capital LLC?
14 A  No, he did not.
15 Q  Do you know if any deal -- if Valor
16 continued working on any deals after -- strike that.
17     Do you know if Valor worked on any deals
18 that were originated by MG Capital LLC?
19 A  I'm not sure.
20 Q  What efforts did you -- oh, do you know if
21 anybody at MG Capital LLC signed a confidentiality
22 agreement?
23 A  I'm not sure.
24 Q  Did Dan Barlow?

**Page 367**

1  A  I'm not sure.
2  Q  Do you know if Tom Horak did?
3  A  I'm not sure.
4     (Document marked Plaintiff's
5     Deposition Exhibit No. 51.)
6  BY MR. LATHAM:
7  Q  I'm going to show you what's been marked as
8  Plaintiff's Exhibit 51.
9     Do you recognize that document?
10 A  Yes.
11 Q  Is that a confidentiality agreement between
12 Dan Barlow and Connector Service Corporation and MG
13 Capital LLC?
14 A  Yes.
15 Q  Did you ever ask Brian to sign a similar
16 document?
17 A  I'm not sure.
18 Q  Who is Scott Wallace?
19 A  I'm not sure.
20     (Document marked Plaintiff's
21     Deposition Exhibit No. 52.)
22 BY MR. LATHAM:
23 Q  Let me show you what's been marked as
24 Plaintiff's Exhibit 52.

**Page 368**

1     Does that refresh your recollection as to
2  who Scott Wallace is?
3  A  No, it does not.
4  Q  Do you know who Victor Morganstern is?
5  A  Yes.
6  Q  Who's Victor Morganstern?
7  A  He's -- he was an investor in Industrial
8  Powder Coatings.
9     (Document marked Plaintiff's
10    Deposition Exhibit No. 53.)
11 BY MR. LATHAM:
12 Q  Let me show you what's been marked as
13 Plaintiff's Exhibit 53.
14    Do you know why he was signing a
15 confidentiality agreement?
16 A  I would imagine it was because we were going
17 to be disclosing information to him from -- relating to
18 Industrial Powder Coatings.
19 Q  Did you disclose your financial model
20 outside of MG Capital LLC?
21 MR. CAULEY: The model or a printout?
22 MR. LATHAM: A printout.
23 THE WITNESS: Yes, we disclosed it to potential
24 investors.

**Page 369**

1  BY MR. LATHAM:
2  Q  And that was a question that was raised.
3     Is the printout of the document proprietary
4  or is the computer model itself?
5  A  I think the format and layout of the
6  printout is proprietary, yeah.
7  Q  And the computer model?
8  A  The computer model, yeah.
9  Q  Did you disclose the printout to anybody
10 outside of MG Capital LLC?
11 A  Printout, we disclose it to potential
12 investors, potential lenders.
13 Q  Did you get signed confidentiality
14 agreements from them?
15 A  It appears from some.
16 Q  Do you know if you got them from all?
17 A  I do not know.
18    (Document marked Plaintiff's
19    Deposition Exhibit No. 54.)
20 BY MR. LATHAM:
21 Q  I show you what's been marked as Exhibit
22 54.
23    Who is Richard Wenno?
24 A  I'm not sure. It appears that he works for

**Page 370**

1  National City Commercial Finance.
2  Q  Who is National City Commercial Finance?
3  A  I do not remember. I would imagine he's a
4  potential -- he works -- I believe National City would
5  be a lending source for the Industrial Powder Coatings
6  transactions.
7  Q  Attached to it is a spreadsheet.
8     Is this your computer model, your financial
9  model?
10 A  Yes, it is.
11 Q  This was produced by Brown, Gibbons, Lang.
12    Do you know how they got a copy of it?
13 A  No, I do not.
14 Q  Do you know if you signed a confidentiality
15 agreement related to your financial model with Brown,
16 Gibbons, Lang?
17 A  No, I do not know.
18 Q  Do you know if you signed any
19 confidentiality agreement with National City Commercial
20 Finance?
21 A  I do not know.
22 Q  Are there commercial financial models
23 available on the market?
24 A  I'm sure there are.

**Page 371**

1  Q  Do you know how yours differs from those?
2  A  I do not specifically know how they differ.
3  Q  I show you again what was marked as Exhibit
4  50. And just to save us some time, which I'm sure
5  you'll appreciate, this is a letter to Steven Elkind.
6  A  Yes.
7  Q  To your knowledge, was Brian prevented from
8  contacting Steven Elkind after leaving MG Capital to
9  find new deals?
10 MR. CAULEY: Objection as to form, calls for
11 legal conclusion.
12 THE WITNESS: In general, I think the answer
13 would be no. I think if he was contacting him to do
14 damage to us, the answer would be yes.
15 BY MR. LATHAM:
16 Q  If Steven had a deal that Brian might be
17 interested in, it wasn't a deal that he had learned of
18 from MG Capital, that would be okay in your mind?
19 A  It would not be okay in my mind.
20 Q  Why?
21 A  Because it's not -- the relationship with
22 Steven Elkind would not be one that he would otherwise
23 had but for working at MG Capital.
24 Q  So Steven Elkind --

**Page 372**

1  A    For a period of time. I mean, I think at
2  some point in time, it would have been fine for him to
3  do. I think immediately after leaving, it wasn't fine
4  to do.
5  Q    Why?
6  A    Because I think that he was doing damage to
7  MG Capital.
8  Q    Is Steven Elkind a proprietary deal source
9  of MG Capital LLC?
10  A    No, he is not.
11  Q    Who is Thomas Munkhouser?
12  A    I'm not sure.
13  Q    Do you know if he's a proprietary deal lead
14  of MG Capital LLC?
15  A    I'm not sure.
16  Q    Do you know an Acquisition Strategy or a
17  Bill Brennan?
18  A    The name sounds familiar, but I'm not sure.
19  Q    Do you know if that's a proprietary deal
20  lead of MG Capital LLC?
21  A    I'm not sure.
22  Q    Why aren't you sure?
23  A    Antonio might be aware of it, Antonio
24  Gracias.

**Page 373**

1  Q    Adams Business Consultants, Inc.?
2  A    I'm not sure.
3  Q    Richard Labin?
4  A    Again, I'm not sure.
5  Q    What would constitute a proprietary deal
6  lead in your mind, somebody that Brian couldn't contact
7  under any circumstances?
8  A    Couldn't contact under any circumstances. I
9  don't think that there was any under that definition.
10  Q    Do you know who Jim Throne is?
11  A    Yes.
12  Q    Who's Jim Throne?
13  A    He's a business broker.
14  Q    Who found Jim Throne as a business broker?
15  A    I think it was Antonio Gracias, but I'm not
16  sure.
17  Q    Do you consider him a proprietary deal
18  source?
19  A    No, I do not.
20        (Document marked Plaintiff's
21        Deposition Exhibit No. 55.)
22  BY MR. LATHAM:
23  Q    Showing you what's been marked as
24  Exhibit 55.

**Page 374**

1  Do you know what this document is?
2  A    I do not.
3  Q    Can you tell me if you recognize anybody on
4  there that you would consider to be a proprietary deal
5  source for MG Capital LLC?
6  A    I'm not sure.
7  Q    Have you reviewed it?
8  A    Oh, no, I have not. I just glanced at it.
9  You have Antonio Gracias and myself on this list. You
10  have people who work in MG Capital on this list.
11  Q    I didn't make the list.
12  A    Oh.
13  Q    If you look at the bottom, it says IPC.
14  That indicates it came from you.
15  A    Oh. It appears to be a list of sources
16  that -- I'm not sure why this was prepared. I don't
17  want to guess.
18  Q    I'm not asking you why it was prepared.
19        I'm asking you are any of those people on
20  that list proprietary deal leads, acquisition sources,
21  financing sources of MG Capital LLC?
22  A    Well, I would imagine at a minimum the
23  individuals referred to who were working at MG Capital
24  would be.

**Page 375**

1  Q    Okay. Anybody else?
2  A    I'm not sure. I'd have to -- I'd have to
3  spend more time thinking about it.
4  Q    I only got today.
5  A    Okay. I'm sorry.
6  Q    You can't go home and continue this
7  deposition without me, Alain.
8  A    Okay.
9  Q    I'll be happy to go with you to New York,
10  you buy me dinner, we'll talk about it.
11  A    Okay. Okay. Again, I would need more
12  time. I mean, I've been away from the active part of
13  this business for awhile.
14  Q    Have you ever personally inputted data into
15  the financial model?
16  A    I have.
17  Q    To your knowledge, have you made changes to
18  it?
19  A    I can't recall making any changes on it.
20  Q    When was the GAMCREFK -- now, the GAMCREFK
21  Trust is the predecessor trust -- the successor?
22  A    Successor.
23  Q    Successor name to the Kodsi Family Trust?
24  A    Yes.

**Page 376**

1  Q    There wasn't a new trust made?
2  A    No.
3  Q    When was that formed?
4  A    I believe it was formed January 1, 1998.
5  Q    Why?
6  A    On the advice of my lawyer at the time.
7  Q    In your mind, why did you form it?
8  MR. CAULEY: Go ahead.
9  THE WITNESS: I formed it in order to provide
10  security for my mother and my wife and to insulate
11  investments from any business activities that I was
12  involved with.
13  BY MR. LATHAM:
14  Q    What business activities?
15  A    Anything that I would be doing.
16  Q    How would that insulate them from your
17  business activities?
18  A    You'd have to speak to the lawyers. I was
19  relying on their advice.
20  Q    When did you -- any other reasons to your
21  knowledge?
22  A    Again, you'd have to speak to the lawyers.
23  I mean, they had -- they presented a litany of them. I
24  don't remember them all in detail.

**Page 377**

1  Q    What assets went into the GAMCREFK Trust?
2  And I say this that way because it's a little hard to
3  pronounce. I don't mean to put any emphasis on
4  anything.
5  A    No.
6  MR. CAULEY: You're including in your definition
7  the predecessor trust?
8  MR. LATHAM: Well, they're the same entity. It's
9  just different names.
10  THE WITNESS: It was determined that all assets
11  that I had at the time would go into it except for
12  Connector Service Corporation.
13  BY MR. LATHAM:
14  Q    Okay. Why not Connector Service
15  Corporation?
16  A    The lawyers advised that --
17  MR. CAULEY: Well, I'm going to let him talk about
18  it as long as you don't view it as a more general
19  waiver.
20  MR. LATHAM: You know, as long as he doesn't say
21  they said or I said to them, I'm not going to consider
22  it a waiver.
23  THE WITNESS: Then I can't because they said.
24  MR. LATHAM: Then I'll agree that it's not a

### Page 378

1  waiver.
2  MR. CAULEY: Okay. Go ahead. It's not a waiver.
3  THE WITNESS: Okay.
4  MR. CAULEY: Go ahead.
5  THE WITNESS: They looked at the assets that I
6  owned at the time, and they concluded that it was not
7  prudent to transfer the Connector Service Corporation
8  stock in because of potential environmental liabilities
9  associated with those businesses, and that it should be
10 transferred in at a later point when it was -- when
11 they were being -- when if we ever sold them.
12      But it was always contemplated that they
13 would be in there, and that was done -- they -- I mean,
14 they developed a plan in the middle of 1997. And
15 they -- everything was prepared, and they determined
16 to establish it on December 1. I'm not sure why they
17 did the dates that they did.
18 BY MR. LATHAM:
19   Q   Was your ownership interest in CSC ever
20 transferred into the trust?
21   A   It was.
22   Q   What did you receive for that?
23   A   Nothing. I mean, I received nothing.
24   Q   When was it transferred in?

### Page 379

1    A   In the middle of -- in the middle of 2000
2  sometime.
3    Q   Your financial statement says June of 2000.
4        Does that sound right?
5    A   That sounds right. That was again
6  transferred in at the -- at that point, the lawyers
7  said that it needed to be transferred in at that point
8  in time.
9    Q   What does it hold now? What does the
10 GAMCREFK Trust hold now?
11   A   It holds securities, financial securities.
12   Q   Does it hold cash?
13   A   I'm not exactly sure what it owns today.
14   Q   Have you ever received any statements?
15   A   I get copies of statements.
16 MR. LATHAM: Tom, we asked for those, and we were
17 told that they didn't exist.
18 MR. CAULEY: Well, I have no -- I'll go back and
19 research, but I have no information.
20 MR. LATHAM: I understand.
21 THE WITNESS: At the time they asked me, I didn't
22 have a copy of the statement.
23 BY MR. LATHAM:
24   Q   Do you have any copies?

### Page 380

1    A   I don't have a copy, no.
2    Q   Do you receive copies?
3    A   I have received copies, yes.
4    Q   Okay. You don't have any?
5    A   I have a copy -- I have a copy of the trust
6  statement, yes, I do. I have a copy.
7    Q   Okay.
8  MR. CAULEY: We'll talk about it. I'll take it
9  under advisement.
10 BY MR. LATHAM:
11   Q   Do you know if that shows the IPCAC
12 investment?
13   A   I don't believe it reflects it.
14   Q   Okay.
15   A   On the statement.
16   Q   Do you have a prenuptial agreement with your
17 wife?
18   A   No, I do not have a prenuptial agreement
19 with my wife.
20   Q   Well, I ask because she's --
21 MR. CAULEY: Just -- you don't have to explain.
22 Let's just move on.
23 BY MR. LATHAM:
24   Q   Okay. Other than your -- other than -- I

### Page 381

1  believe that your interest in MG Capital LLC was
2  transferred into the GAMCREFK Trust at the time it was
3  the Kodsi Family Trust.
4    A   I'm sorry. Could you repeat the first part?
5    Q   The MG Capital LLC interest, do you know
6  when that was?
7    A   I don't remember exactly.
8    Q   Do you know any other assets other than your
9  interest in CSC that were transferred into the trust?
10   A   I think all my assets were transferred into
11 the trust, apart from the CSC, and it took the lawyers
12 some time --
13   Q   At the same time?
14   A   I think it took the lawyers some time to do
15 it. I don't remember the specific dates or times.
16 They had to get approvals. I don't remember the
17 process. I remember that there were like obstacles
18 that they had to go through to get the stuff
19 transferred.
20   Q   What obstacles?
21   A   I don't remember.
22   Q   Was your interest in CSC transferred or was
23 the cash value of your interest in CSC transferred into
24 the trust?

### Page 382

1    A   The actual equity of CSC was transferred in.
2    Q   And you were eventually bought out from CSC?
3    A   Yes.
4    Q   How much?
5    A   How much of what?
6    Q   How much were you paid?
7  MR. CAULEY: Well, now, if the equity is in a
8  trust, you weren't paid.
9  MR. LATHAM: Well, I'm asking --
10 MR. CAULEY: The trust was paid.
11 BY MR. LATHAM:
12   Q   How much was paid for the equity?
13   A   Of what?
14   Q   Of CSC.
15   A   Well, CSC was comprised of a lot of
16 businesses at that time.
17   Q   Right.
18       Has the GAMCREFK Trust received any moneys
19 from its ownership of CSC or its related entities?
20   A   Yes, it has.
21   Q   How much?
22   A   Approximately $20 million.
23   Q   When?
24   A   Approximately February of 2001.

### Page 383

1    Q   Do you own any -- does GAMCREFK Trust own
2  any further interest in CSC or its related entities?
3    A   No, not that I'm aware of.
4    Q   And the money from IPCAC was put into the
5  GAMCREFK Trust too?
6    A   Yes, they received it, yes.
7    Q   I'm going to go look for that section 6 and
8  talk to Brian for about five seconds.
9  MR. CAULEY: Sure.
10 MR. LATHAM: And I think -- you know, I told you
11 noon. I'm going to hold you to it. I got to come up
12 with something for the next half hour.
13 MR. CAULEY: We could make airplanes if you finish
14 more quickly.
15      (A brief recess was taken from the
16      hour of 11:21 a.m. to the hour of
17      11:28 a.m.)
18 BY MR. LATHAM:
19   Q   This is the extent of the documents that
20 were produced along with your statement. I do have a
21 quick question.
22   A   Yeah. This has everything. That has a
23 statement in it.
24 MR. CAULEY: A trust statement?

### Page 384

1  THE WITNESS: Yes.
2  BY MR. LATHAM:
3  Q  Yes, it does.
4     Was this notarized at some point?
5  A  The document I sent -- oh, there is -- yeah,
6  there is a notarized copy. I don't think I gave -- I
7  mean, I don't know. I just gave you a copy. Multiple
8  copies were made, and I gave you a copy of one of the
9  ones that was made. I mean, I gave it to Scott Stein.
10         (Document marked Plaintiff's
11         Deposition Exhibit No. 56.)
12 BY MR. LATHAM:
13 Q  Showing you what's been marked as Exhibit
14 56, which is identified as IPC 029486 through IPC
15 029501.
16    Is this a statement of the GAMCREFK Trust?
17 A  It is. Yes, it is. It's a statement that I
18 provided.
19 Q  Okay. Can you tell me if there is -- if
20 IPC -- the trust's ownership of IPCAC is included on
21 this document?
22 A  No, it isn't. No, it is not.
23 Q  Okay.
24 MR. CAULEY: And just so the record is clear, I

### Page 385

1  think he indicated he wasn't sure whether the trust
2  owned any shares of that company.
3  MR. LATHAM: I don't know if I would agree with
4  that, but I'm not --
5  THE WITNESS: Right.
6  MR. CAULEY: I think he further indicated some
7  shares may well be owned by the trust but have no
8  value, which again I don't think is reflected on there.
9  MR. LATHAM: I'm trying to find a tab number that
10 says 6. But if it's not there, I'll talk to Scott.
11 MR. LATHAM: Go home.
12 THE WITNESS: Thank you.
13 MR. CAULEY: I've got a couple of questions,
14 just a couple.
15         EXAMINATION
16 BY MR. CAULEY:
17 Q  Mr. Kodsi, earlier you were asked questions
18 about whether any particular deal source was
19 proprietary and whether Mr. Sullivan was prohibited
20 from contacting any particular person who may have been
21 a source of deals.
22    Do you recall questions along those lines?
23 A  Yes.
24 Q  Did MG Capital have lists of prospective or

### Page 386

1  deal sources that it used?
2  A  It did.
3  Q  Do you consider the lists or the identity of
4  the deal sources to be proprietary information of MG
5  Capital?
6  A  I do. I do. We worked really hard over a
7  long period of time to put all that stuff together.
8  MR. CAULEY: That's all the questions I have.
9         FURTHER EXAMINATION
10 BY MR. LATHAM:
11 Q  Where is that list?
12 A  It would have been in a database. I
13 actually think that the information -- that one of the
14 exhibits that you provided is a subsection of that
15 database.
16 Q  Okay. And I asked you whether you
17 considered anybody on those lists to be proprietary,
18 and I believe your answer was no.
19 MR. CAULEY: I believe he said he didn't recall.
20 He didn't know.
21 THE WITNESS: I don't recall. Individually, I
22 think you can talk to any of the individuals. I think
23 your questions were, you know, is there any individual
24 that is a proprietary individual. I think that the

### Page 387

1  compilation of the list, I think that is something -- I
2  mean, you come in. We spend all this time working to
3  put together our contacts on both the source side and
4  the financing side.
5     Are any one of those names proprietary, no,
6  I don't think so. But is the work that we did to say
7  that this is a subsection of all the people in the
8  world that we can work with for these kinds of
9  transactions, is that proprietary, I think it is. I
10 think that is proprietary, and we worked really hard to
11 do it.
12 BY MR. LATHAM:
13 Q  Well, to your knowledge, did Brian take that
14 list?
15 A  I'm not sure but -- again, every time that I
16 talk to the lawyers, they show me something else that
17 he took.
18 Q  If Brian contacted -- referring to Exhibit
19 35 --
20 A  I think if he made a mass mailing or made a
21 mailing of names as a group that he obtained because he
22 worked at MG Capital, I think that he took a
23 proprietary asset, yes. Because he would never have
24 come up with that list, that group of individuals to

### Page 388

1  get in touch with by himself.
2  Q  If he made the mass mailing from -- if he
3  made a mass mailing to people that he got from a
4  directory of deal sources or deal leads.
5  A  Right.
6  Q  That included all or most of the people on
7  the list, would that be okay?
8  MR. CAULEY: Well, it assumes facts not in
9  evidence.
10 THE WITNESS: I tremendously doubt that the
11 specific individuals that we dealt with at these
12 organizations would be on those lists.
13    You could send a letter to Houlihan, Lokey,
14 but you're not going to send it to Lee Lewis at
15 Houlihan, Lokey.
16 BY MR. LATHAM:
17 Q  Do you know how Brian -- do you know --
18 what did you do to keep this list confidential?
19 A  You know, we didn't -- to my knowledge, we
20 didn't share it with people outside of MG Capital.
21 Q  Inside MG Capital, what did you do to keep
22 it confidential?
23 A  Well, evidently we had a number of employees
24 sign confidentiality agreements.

### Page 389

1  Q  But you didn't have Brian sign one?
2  A  I'm not sure.
3  Q  This is the only list you've identified as a
4  proprietary investor list.
5  MR. CAULEY: Well, it's the only one he's been
6  shown.
7  THE WITNESS: I haven't identified it or -- I
8  haven't identified any list.
9  BY MR. LATHAM:
10 Q  Never?
11 A  Nothing outside of talking with attorneys.
12 Q  Look at your answer to interrogatory 8.
13 A  Okay.
14 Q  Okay. Look at Exhibit 55.
15 A  Okay.
16 Q  Is that the list you refer to in your
17 answer to the interrogatories?
18 A  It appears to be.
19 Q  And in the answer to interrogatory, you
20 didn't identify any other list?
21 A  It appears not.
22 Q  Okay. Can you tell me who on that list was
23 identified as a deal source after the incorporation of
24 MG Capital LLC?

Page 390

1   A   I can't specifically tell you.
2   Q   Have you looked at the document?
3   A   Yes.
4   Q   Everybody on the list?
5   A   I have glanced through the document, and I
6   have glanced through all the names on the list.
7   Q   Okay. And based on your review of that
8   list, and I'm asking you to review it.
9   A   Right.
10  Q   Which ones were developed as potential deal
11  leads after MG Capital LLC was formed?
12  A   I am not sure of -- I'm not sure of the
13  timing of when these leads were formed. I'm not sure
14  of the time of these leads.
15  Q   So is it possible that the deal leads
16  were -- you were aware of these deal leads prior to
17  the formation of MG Capital LLC?
18  MR. CAULEY: Objection, calls for speculation.
19  THE WITNESS: It's possible.
20  BY MR. LATHAM:
21  Q   But you don't know?
22  A   I'm not sure.
23  Q   Okay. Do you know of anybody on this list
24  that Brian was contacting?

Page 391

1   A   I don't know. I don't know.
2   Q   Do you know if Brian kept a -- strike that.
3   MR. LATHAM: Signature?
4   MR. CAULEY: Reserve.
5   No further questions.
6
7
8
9       DEPOSITION CONCLUDED

Page 392

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION
3   MG CAPITAL LLC,       )
       Plaintiff,         )
4   vs.                   ) No. 01 C 5815
    BRIAN T. SULLIVAN, et al.,  ) Judge John W. Darrah
5      Defendants.        )
    BRIAN T. SULLIVAN,    )
6      Counterplaintiff,  )
    vs.                   )
7   MG CAPITAL LLC,       )
       Counterdefendant,  )
8   and                   )
    ALAIN KODSI, et al.,  )
9      Defendants.        )
10  IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
    COUNTY DEPARTMENT - LAW DIVISION
11
    BRIAN T. SULLIVAN,    )
12     Plaintiff,         ) No. 00 L 1973
    vs.                   ) Judge Allen S. Goldberg
13  ALAIN KODSI, et al.,  )
       Defendants.        )
14
15  I, ALAIN DAMIAN KODSI hereby certify that I
    have read the foregoing transcript of my deposition
16  taken on April 23 and April 24, 2002, and that to the
    best of my knowledge it is a true and correct
17  transcript of said deposition, except as I have changed
    it on the attached sheets in accordance with the rules
18  provided by the said Court.
           Corrections were made.
19     ___ No corrections were made.
20     _____
           ALAIN DAMIAN KODSI
21
    SUBSCRIBED AND SWORN TO
22  before me this ___ day
    of ___, 2002.
23
24  _____ Notary Public

Page 393

1   STATE OF ILLINOIS  )
                       ) SS:
2   COUNTY OF C O O K  )
3       I, Julia Miranda, a notary public within and
4   for the County of Cook and State of Illinois, do hereby
5   certify that ALAIN DAMIAN KODSI personally appeared
6   before me on April 23 and 24, 2002, as a witness in a
7   cause now pending and undetermined in the United States
8   District Court, Northern District of Illinois, Eastern
9   Division, wherein MG Capital LLC is Plaintiff; Brian T.
10  Sullivan, et al., are Defendants; Brian T. Sullivan is
11  Counterplaintiff; MG Capital LLC, et al., are
12  Counterdefendants; and Alain Kodsi, et al., are
13  Defendants; No. 01 C 5815; and in the Circuit Court of
14  Cook County Illinois, County Department, Law Division,
15  wherein Brian T. Sullivan is Plaintiff; and Alain
16  Kodsi, et al., are Defendants; No. 00 L 1973.
17      I further certify that the said
18  ALAIN DAMIAN KODSI was by me first duly sworn to
19  testify the truth, the whole truth and nothing but the
20  truth in the cause aforesaid before the taking of his
21  deposition, that the testimony given was
22  stenographically recorded by me in the presence of said
23  witness, and afterwards reduced to writing via
24  computer-aided transcription, and that the foregoing is

Page 394

1   a true and correct transcript of said testimony.
2       I further certify that there were present at
3   the taking of this deposition the appearances
4   heretofore noted.
5       I further certify that I am not counsel for
6   nor in any way related to any of the parties to this
7   suit, nor am I in any way interested in the outcome
8   thereof.
9       IN TESTIMONY WHEREOF, I have hereunto set my
10  hand and seal this 1st day of May, 2002.
11
12
13
14
15
16      _____
        Julia Miranda, CSR
        Notary Public, Cook County, IL
17      C.S.R. License No. 084-003166